335 F.2d 153
 UNITED STATES of America, Appellant,
v.
Neely B. MAYTON, John Allen Blackburn, Floyd Bamberg, as
Registrars of Voters of Perry County, Alabama, and
State of Alabama, Appellees.
UNITED STATES of America, Petitioner,
v.
Honorable Daniel H. THOMAS, Respondent.
 Nos. 21014, 21032.
 United States Court of Appeals Fifth Circuit.
 July 23, 1964.
 
 Vernol R. Jansen, Jr., U.S. Atty., Mobile, Ala., David Rubin, Harold H. Greene, Attys., Dept. of Justice, John Doar, First Asst. Atty. Gen., Dept. of Justice, David L. Morman, Atty., Dept. of Justice, Washington, D.C., Burke Marshall, Asst. Atty. Gen., Howard A. Glickstein, Alan G. Marer, Battle Rankin, Attys., Dept. of Justice, Washington, D.C., for appellant.
 Richmond M. Flowers, Atty. Gen. of Ala., Gordon Madison, Asst. Atty. Gen. of Ala., Montgomery, Ala., for appellees.
 Before HUTCHESON and BROWN, Circuit Judges, and CHRISTENBERRY, district judge.
 JOHN R. BROWN, Circuit Judge.
 
 
 1
 The serious question presented by this case may be simply stated. What is the proper role of the District Judge in the administration of 601(a) of the Civil Rights Act of 1960 following the finding of a pattern or practice of voter racial discrimination?[1] The underlying facts are these.
 
 
 2
 On August 27, 1962, the United States, pursuant to the authority granted in 131(c) of the Civil Rights Act of 1957,[2] filed a complaint in the District Court which alleged that the defendants, the State of Alabama and the Registrars of Perry County, Alabama[3] had engaged in racially discriminatory acts and practices in the voter registration process in Perry County. The complaint prayed for an injunction and a finding that the alleged discrimination was pursuant to a pattern or practice, a finding which is a statutory condition to the utilization of the Judge-Referee machinery created by 601(a) of the Civil Rights Act of 1960.[4] On October 26, 1962, the District Judge heard the motion for preliminary injunction, and on November 15, 1962, entered an order which, among other things, enjoined the defendants from engaging in 'any act or practice which involves or results in distinctions based on race or color in the registration of voters in Perry County, Alabama.' After further proceedings in the District Court not material to the precise issue before this Court culminated in an order by the District Judge on May 17, 1963,[5] nothing further happened until August 6, 1963. On that date 142 letters characterized by the District Judge as 'writings' were handed to the Chief Deputy Clerk in the District Clerk's office. On August 15, 1963, the District Judge entered an order which, among other things, contained the following:
 
 
 3
 'The Court is of the opinion that said writings, if intended as applications for registration under the provisions of 42 USCA 1971(e), Civil Rights Act of 1960, do not contain requisite information to qualify them as such applications, and are therefore not entitled to recognition as such.'
 
 
 4
 Another 33 letters received in the District Clerk's office on September 17, 1963, were similarly disposed of by order of the District Judge entered September 27, 1963. Though the orders are unilluminated by findings or memorandum opinion, it seems quite certain that in this initial exposure to the post-pattern-or-practice mechanism, the Judge in good faith believed that, though informally prepared, each application had to pass the lawyers' test of setting out each of the minimum elements of the right much as would a pleader of a civil action, F.R.Civ.P. 2.
 
 
 5
 The United States appeals from these orders, asserting that the District Judge erred in rejecting the letters as insufficient to constitute applications for orders declaring the applicants qualified to vote as contemplated by 42 U.S.C.A. 1971(e).[6]
 
 
 6
 We are met at the outset with contentions that (1) the orders of the District Judge are not appealable and (2) the United States is not a proper party appellant.
 
 I.
 Orders Appealable
 
 7
 The statute refining the jurisdiction of Courts of Appeals provides that we have jurisdiction of appeals from all final decisions of the District Courts except where a direct review may be had in the Supreme Court. 28 U.S.C.A. 1291.[7] The orders here appealed from are admittedly not final in the sense that they fully terminate an entire cause. If the statute allows appeals only from judgments which are final in this sense, the orders in this case are not appealable.
 
 
 8
 However, the Supreme Court has long recognized a small class of orders, now referred to as collateral orders, which are offshoots from the principal litigation in which they are issued, and which are immediately appealable as 'final decisions' without regard to the posture of the principal litigation.[8] As noted by Professor Wright, the leading case is Cohen v. Beneficial Industrial Loan Corp., 1949, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528. In that case the Supreme Court held that an order of the District Court in a stockholders' suit denying the defendant's motion to require plaintiff to post security for defendant's costs was appealable as a final decision within the meaning of 28 U.S.C.A. 1291. In so holding, the Court said:
 
 
 9
 'This decision appears to fall in that small class which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated. * * *
 
 
 10
 'We hold this order appealable because it is a final disposition of a claimed right which is not an ingredient of the cause of action and does not require consideration with it.'[9]
 
 
 11
 The Court stated in that opinion that it had 'long given this provision of the statute this practical rather than a technical construction,' and its subsequent decisions indicate that it will continue to do so.[10]
 
 
 12
 In United States v. Wood, 5 Cir., 1961, 295 F.2d 772, 778, cert. denied, 1962, 369 U.S. 850, 82 S.Ct. 933, 8 L.Ed.2d 9, we held that an order denying a temporary restraining order against a state criminal prosecution was immediately appealable under the doctrine.[11] After analysis of the Cohen case and other Supreme Court decisions, we concluded that,
 
 
 13
 'An order, otherwise nonappealable, determining substantial rights of the parties which will be irreparably lost if review is delayed until final judgment may be appealed immediately under section 1291.'
 
 
 14
 The right claimed by each of the applicants here is the right to an order pursuant to 42 U.S.C.A. 1971(e) 'declaring (each) qualified to vote.' The orders of the District Judge rejecting such applications finally determine these claims of right. After the order, none of the applications is pending. Nothing further remains to be done. So far as a particular applicant on this application is concerned, it is all over. Like any plaintiff whose complaint has been dismissed for failure to state a claim, F.R.Civ.P., 12(b), the order is the end of the claim on its merits unless appealed from and reversed.[12] The orders are too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated. The main suit will not terminate until the discrimination is ended. As in Cohen and Wood, when that time comes it will be too late effectively to review the orders, and the rights conferred by subsection (e) will have been lost, probably irreparably. We therefore hold that the orders of the District Court are appealable.
 
 II.
 The United States the Proper Appellant
 
 15
 The contention that the United States is not a proper party appellant may be briefly disposed of. The argument rests on a misconception of a suit under the Civil Rights Acts. As Judge Wisdom said for the Court in United States v. Manning, W.D.La., 3-Judge, 1963, 215 F.Supp. 272, 294:
 
 
 16
 'The controversy is not between certain aggrieved Negroes and the defendants. The controversy is between the United States and the named defendants.'
 
 
 17
 There is only one suit pending in the District Court-- the subsection (c), 42 U.S.C.A. 1971(c), suit. The right of the United States to maintain the suit and obtain injunctive relief is created by 131(c) of the 1957 Act, 42 U.S.C.A. 1971(c). As was further pointed out in Manning, the suit is designed to 'vindicate the public interest in the constitutional right of all citizens to be free from racial discrimination in exercising voting rights.' 215 F.Supp. 272, at 295. This is not lessened by 601(a) of the 1960 Act, 42 U.S.C.A. 1971(e) which also creates a practical means of effectuating that right by providing for orders declaring certain named individuals entitled to vote. When the mechanism is stopped by action of the District Judge from which an appeal may be taken, the proper party appellant is the United States. As Judge Wisdom observed for the Court in Manning, the United States is the real party aggrieved by the discrimination, 215 F.Supp. 272, 295, and, as we see here, is the plaintiff in the only suit pending in the District Court. There is no merit to the contention that the United States is not a proper party appellant.[13]
 
 III.
 Pattern-or-Practice Declared
 
 18
 Before determining whether the applications were sufficient, we must first dispose of the contention that no pattern or practice finding was made by the District Court and thus 1971(e) procedures may not be invoked. We find no merit in this.
 
 
 19
 Judge Thomas made this finding in connection with the issuance of the injunction of November 15, 1962:
 
 
 20
 '3. Since at least 1959 the defendants have engaged in acts and practices which have had the purpose and effect of depriving Negroes of their right to register without distinction of race or color.'
 
 
 21
 The words pattern or practice were not intended to be words of art. No magic phrase need be said to set in train the remedy provided in 1971(e). Congress so understood them. And the legislative history reflects the adoption of the approach epitomized by Deputy Attorney General Walsh before the House Judiciary Committee:
 
 
 22
 'Pattern or practice have their generic meanings. In other words, the court finds that the discrimination was not an isolated or accidental or peculiar event; that it was an event which happened in the regular procedures followed by the state officials concerned.'[14]
 
 
 23
 That interpretation was reiterated by Mr. Walsh in subsequent testimony,[15] and it was confirmed on the floor of the Senate by Senator Keating on the day the Act was passed:
 
 
 24
 'The 'pattern or practice' requirement means only that the proven discriminatory conduct of the defendants was not merely an isolated instance of racial discrimination.'[16]
 
 
 25
 In short, by the prayer in the complaint of the United States in the subsection (c) suit, the District Judge was requested to make a pattern or practice finding. On such a complaint and with evidence establishing the claim, the statutory machinery calls for a finding whether the deprivation was due to a pattern or practice. See United States v. Manning, W.D.La., 3-Judge, 1963, 215 F.Supp. 272, 290. He found that it was, and there-- on this record-- our inquiry ends.[17]
 
 IV.
 Nature of the 1971(e) Machinery
 
 26
 This brings us to the merits. When Congress passed the voting provisions of the Civil Rights Act of 1957, it believed that they would be effective tools in fulfilling the Federal Government's responsibilities under the 14th and 15th Amendments to the Constitution.[18] The provisions were effective, but Congress found it necessary to legislate again in 1960 with respect to this problem of assuring full rights of suffrage to all Americans. Section 601(a)[19] of the 1960 Civil Rights Act was part of that legislation. It added a new subsection (e) to 42 U.S.C.A. 1971. The new subsection comes into play only upon a finding that persons have been deprived of rights guaranteed by 42 U.S.C.A. 1971(a) on account of race or color and that such deprivation was or is pursuant to a pattern or practice.[20] After a pattern or practice finding, Negroes denied the right to register or whose registration application is rejected are entitled to an order declaring them qualified to vote.[21] State election officials are compelled by the statute to treat such person as a fully qualified voter for all elections.
 
 
 27
 There is no doubt that before adoption of the 1960 Act a decree could be rendered against a registrar requiring him to register all qualified persons of the race against whom he had discriminated in the past.[22] In Alabama v. United States, 5 Cir., 1962, 304 F.2d 583, aff'd mem., 1962, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112, we affirmed a District Court decree which affirmatively required that registration certificates be issued to 54 named Negro applicants. There are not only obvious difficulties and expense in relitigating the issue of discrimination each time a person is denied the opportunity to register or is rejected as not qualified. Experience caused Congress to conclude that this single-bite approach was ineffective and was only a slight deterrent to purposeful discrimination. Registrars would know, of course, that they would someday be brought to book. But when? What book? Overburdened courts and congested dockets were thus an unwitting tool in postponement of the hope of ultimate equality of treatment. That is where 1971(e) comes into play.
 
 
 28
 As the preceding analysis of that subsection indicates, when the District Court finds in a subsection (c) suit that voter rights have been denied by a pattern or practice of racial discrimination, members of this race who are subsequently denied their voting rights are entitled to an order of the Court declaring them qualified to vote without the necessity of relitigating the issue of racial discrimination.[23] However, even this simplified procedure presents certain mechanical problems which are graphically demonstrated by the present case.
 
 
 29
 The machinery is set in motion by an 'application.' What is a sufficient application within the meaning of 1971(e)? The District Judge obviously knew why the 175 letters were sent and what they were. He rejected them not because he was unable to tell they were 1971(e) applications, but because they did 'not contain requisite information to qualify them as such applications, and (were) therefore not entitled to recognition as such.'
 
 
 30
 Of course there must be some writing. But it is clear that Congress did not contemplate a formal petition in the nature of a complaint when it spoke of an application. Judge Walsh, then Deputy Attorney General, testifying before the House Judiciary Committee, said:
 
 
 31
 'It is not a complaint; it is an application to vote.'[24]
 
 
 32
 To treat the application as meaning a formalized complaint would be incongruous. Machinery intended to overcome the unavoidable deficiencies of traditional case-by-case adjudication would be bogged down in all of the time-consuming procedures permitted under the Civil Rules. There would be questions of costs, 28 U.S.C.A. 1914(a), necessity of counsel, service of copies, F.R.Civ.P. 5, and the like. Congress thought one civil action was enough. The only civil action contemplated by 1971 is the suit under subsection (c). That suit is well past the pleading stage before subsection (e) can come into play. Indeed, the main trial will have been held.
 
 
 33
 Apart from such technical considerations, it is also clear that Congress had in mind a very simple procedure. Consequently, any intelligible request addressed to the District Court or the District Judge which indicates that such person desires the Court to register him, or otherwise enable him to vote because he has not met with success with state officials is a sufficient application within the meaning of 1971(e). Several things support this result.
 
 
 34
 First, the statute does not require that the application contain any specific information. It merely provides:
 
 
 35
 'Any person of such race or color resident within the affected area shall * * * be entitled, upon his application therefor, to an order declaring him qualified to vote * * *.'
 
 
 36
 Nowhere does it mention the contents of the application. The statute does condition the grant of the order on proof that the applicant is qualified under state law and that since the pattern or practice finding, he has been either (1) denied the opportunity to register or (2) found not qualified by the state registrar. But a further look at the statute confirms that the proof is the important thing and such proof is to be made at a hearing on the application-- not in the application itself. The machinery is to move fast. The statute requires that an application be heard within 10 days. And to meet this duty, the Court is given additional tools. The statute provides that the Judge may appoint a Referee 'to receive such applications and to take evidence and report to the court findings' as to whether the applicant meets requirements for the granting of an order. Again, a hearing, but a special type of hearing, is provided for.[25]
 
 
 37
 The time limits set in the statute for hearing corroborates our view that a simple request is all that is necessary. If formality and specificity are required, then obviously applications failing to meet the requirements would be subject to a time-consuming process of scrutiny and rejection for deficiencies or 'insufficient information.' But the statute requires the applications to be 'heard within ten days.' Applications are also required to 'be determined expeditiously.' These requirements cannot be met if a paper which Congress says may be prepared and submitted by a layman untutored in the law-- perhaps untutored in many things save an irrepressible desire to enjoy the full obligations of citizenship-- is to be subjected to all of that specialized learning which lawyers wrap up in the bewildering concept of a 'cause of action.'
 
 
 38
 Finally, we cannot administer this statute with our eyes closed to the problem that Congress was dealing with in both the 1957 and 1960 Acts. As we put it in Alabama v. United States, 5 Cir., 1962, 304 F.2d 583, 591, aff'd mem., 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112:
 
 
 39
 'Here the matter at stake is the fulfillment of a policy wrought out after extensive consideration of what Congress thought to be contemporary evils by States and agencies of States in the spurious, sometimes sophisticated, sometimes crude, practices by which Negroes were effectively denied the right to vote because of color and race alone.'
 
 
 40
 One of the devices so typically used by state registrars was enjoined by the District Judge in this case. The Judge prohibited the defendant-Registrars from
 
 
 41
 'rejecting applicants for formal, technical, and inconsequential errors or omissions in their application forms.'
 
 
 42
 We have done likewise in a number of situations. United States v. Lynd, 5 Cir., 1962, 301 F.2d 818, 823; 1963, 321 F.2d 26. Surely in enacting this broad remedial legislation, United States v. Raines, M.D.Ga., 1960, 189 F.Supp. 121, 134, Congress did not contemplate the creation of new procedure which would introduce new possibilities of rejecting applications for voter rights for 'formal, technical, and inconsequential errors or omissions.' It knew the applicants would be Negroes, many of whom would be poorly educated and all of whom would be acting without aid of counsel, and it could not have intended that the applications now run a second 'technical gauntlet' reminiscent of the unsuccessful effort to achieve voter registration when appearing before the State officials.
 
 
 43
 We restate. If the Court can tell that the 'writing' is intended as a 1971(e) application by a person who, even in the most general way, is trying to tell the Judge that he wants to be a voter but the State authorities won't permit it, he must treat it as such.
 
 
 44
 As we think the District Judge subjected these applications to an impermissible legal-sufficiency test, it follows that he erred in rejecting the applications as 'insufficient.'[26]
 
 
 45
 The statement of this problem and our decision, without a doubt, impose on conscientious and energetic United States District Judges in areas of asserted voter discrimination a formidable responsibility. The task looms largest from the viewpoint of the machinery by which large numbers of individual voter applicants will be assured that the Judge will be able fairly and diligently to dispose of their cases without, at the same time, devoting so much of the limited and generally overburdened judge-time to these cases as to deny to the countless other litigants even their day in court.
 
 
 46
 Here, as is true in the other areas of spectacular contemporary expansions of federal judicial action, the question whether these and similar challenges will be met depends upon the resourceful ingenuity and 'judicial inventiveness,' Textile Workers Union of America v. Lincoln Mills, 1957, 353 U.S. 448, 457, 77 S.Ct. 912, 1 L.Ed.2d 972, of those who man the 'front line,' Townsend v. Sain, 1963, 372 U.S. 293, 319, 83 S.Ct. 745, 9 L.Ed.2d 770-- United States District Judges.
 
 
 47
 The necessity for exploring all means of solving what appear to be insoluble problems grows out of our developing awareness that 'if the real ideal of justice under law is to be achieved, precious Judge and judicial time must be carefully husbanded and conserved.' Benson v. United States, 5 Cir., 1964, 332 F.2d 288. There we further pointed out: 'To squander efforts unnecessarily is more than an imposition on Judges. It carries the risk that the really meritorious case will be unintentionally slighted. The Supreme Court has given fresh and recent proof that Courts may rightly adapt procedures to lessen or avoid this costly loss of irreplaceable judge-time, Bartone v. United States, 1963, 375 U.S. 52, 84 S.Ct. 21, 11 L.Ed.2d 11, reversing mem. 5 Cir., 1963, 317 F.2d 608, and so have we. Whitney v. Wainwright, 5 Cir., 1964, 332 F.2d 787 (No. 21193, January 17, 1964); Anderson v. United States, 5 Cir., 1963, 318 F.2d 815; Juelich v. United States, 5 Cir., 1963, 316 F.2d 726.'
 
 
 48
 While the likelihood of a Judge, or the District Clerk's office receiving hundreds of written applications from individual voters is an awesome one, it is neither frightening nor impossible. In the first place, Congress has furnished special tools to meet this unprecedented load. The Court may institute the voter Referee system by appointing one or more Referees. 42 U.S.C.A. 1971(e). Indeed, it is the clear sense of congressional purpose that the Court must employ this innovation where because of the volume and complexity of the applications, the task is beyond the physical capacity of the Judge or Judges to do it alone. In addition, both with and without the Referee system, there are a number of other devices which, even from our remote vantage point, seem to us to offer substantial prospects of success if realistic adaptations are made. One device would be official questionnaire-type forms carefully constructed to avoid ambiguities arising from inquiries in conclusory terms, so that the responses would supply factual detail.[27]
 
 
 49
 The situation is not necessarily a choice between rejecting, as was done below, all of these permissibly vague and indefinite writings, or immediately setting each one of them down for a hearing within ten days either before a Judge or before one or more Referees appointed under the statute. Faced with this volume, the District Court may reasonably need some additional information in order to enable it efficiently to utilize and conserve the limited judicial resources at hand. On the standards we have delineated, most of the writings will be technically 'sufficient' but by the use of questionnaire inquiry forms to be handled through the Clerk's office, the Judge without delay can obtain additional information that will actually result in expediting the decision in many situations, and thus advance the final hope of the end to voter racial discrimination. Thus, the Court might provide by appropriate rule and standard that on the receipt of these writings, the Clerk shall ascertain, as to each, whether the information sought on the questionnaire form is revealed. For those that do, the application would go immediately to the Judge for appropriate fixing of the hearing before him or the Referee. As to those not reflecting this information, the Clerk would then transmit the official questionnaire form to each of the applicants requiring that within a stated, and very brief (five days or less) time, the form should be filled out and returned.[28]
 
 
 50
 Just what factual information should reasonably be sought on the questionnaire form will undoubtedly depend on experience gained from a good faith exploratory effort to make such a system work.[29] Such experience might work in two or more directions. It might well indicate the need for additional information and, on the other hand, as to certain situations it might demonstrate that the use of such questionnaire forms has the practical effect of denying to the applicant the benefit of the statute. But a resourceful Judiciary will take advantage of the former and will avoid the latter.
 
 
 51
 Of course the employment of any such devices is always subject to the overriding judicial limitations that neither in fact nor appearance may the practice degenerate into a mere routine. Nor may it be used-- either purposefully as a means, or innocently with the effect-- of further frustrating the acquisition of voter rights free of racial discrimination. But these are not restrictions arising out of the nature of these cases-- civil rights-- or the awesome nature of the prospect of limited number of Judges handling thousands of individual cases. These are limitations inherent in the nature of judging under law.
 
 
 52
 Energetic, resourceful, conscientious Judges who man the United States District Courts in these areas can, and will, find a way to make certain that this law is administered in a way that is faithful to the legislative purpose of eradicating for all time racial discrimination in voter rights. And, in so doing, this will give practical meaning to the general congressional aim that in civil rights cases 'Congress has directed the federal courts to use that combination of federal law, common law, and state law as well as will be best 'adapted to the object' of the civil rights laws,' Lefton v. City of Hattiesburg, Mississippi, 5 Cir., 1964, 333 F.2d 280; Brazier v. Cherry, 5 Cir., 1961, 293 F.2d 401, 409; 42 U.S.C.A. 1988.
 
 
 53
 The result is that we reverse the orders of the District Judge and remand the case for processing of the applications pursuant to 1971(e) and for further and not inconsistent proceedings. On remand, the Judge may well find it helpful to utilize the services of a Referee. The Referee procedure outlined in 1971(e), although made permissive, seems to provide a workable, efficient mechanism and doubtless will be used in many Districts to relieve the Judge of what would otherwise be an almost intolerable burden.
 
 
 54
 No. 21014 Reversed and remanded for further and not inconsistent proceedings.[30]
 
 
 55
 No. 21032 Denied.
 
 
 
 [1]
 Civil Rights Act of 1960, 601(a), 74 Stat. 86, 90, 42 U.S.C.A. 1971(e)
 
 
 [2]
 Civil Rights Act of 1957, 131(c), 71 Stat. 634, 637, 42 U.S.C.A. 1971(c)
 
 
 [3]
 The defendant-Registrars were Neely B. Mayton, John Allen Blackburn, and Floyd Bamberg
 
 
 [4]
 Civil Rights Act of 1960, 601(a), 74 Stat. 86, 90, 42 U.S.C.A. 1971(e); United States v. Ramsey, 5 Cir., 1964, 331 F.2d 824 (dissenting opinion), rehearing hearing granted in part (April 23, 1964); see United States v. Duke, 5 Cir., 1964, 332 F.2d 759
 
 
 [5]
 The proceedings may be briefly detailed. On January 18, 1963, the United States filed an application for an order requiring the defendants to show cause why they should not be held in civil contempt of the November 15, 1962, injunction. On May 17, the District Judge entered another order which (1) specified in detail certain things the defendants were required to do in order to facilitate Negro registration and (2) ordered the defendants to (a) show cause within 60 days why they should not be held in civil contempt for failure to obey the November 15, 1962 order and (b) to further show at such time that the directives of the May 17, 1963 order had been complied with
 
 
 [6]
 The appeal was docketed as No. 21014. As a precautionary measure, the United States also filed with this Court a verified petition for mandamus (No. 21032). In view of our disposition of the appeal, further or extraordinary relief is not needed so we deny the writ of mandamus. Rule 13(b)
 
 
 [7]
 Section 1292, 28 U.S.C.A. 1292, allows appeals from certain interlocutory decisions of the District Courts. The order in this case is not within 1292
 
 
 [8]
 3 Barron & Holtzoff, Federal Practice and Procedure 1193.3 at 33 (Wright ed. 1958). We cite this as Barron & Holtzoff
 
 
 [9]
 337 U.S. 541, at 546-547, 69 S.Ct. 1221, at 1225-1226
 
 
 [10]
 The cases are collected by Professor Wright in 3 Barron & Holtzoff 1193.3. Typical of orders held appealable are those vacating an attachment in admiralty and denying a petition to proceed in forma pauperis
 
 
 [11]
 We have applied this decision in a number of civil rights situations. E.g., Kennedy v. Lynd, 5 Cir., 1962, 306 F.2d 222, 228; McCoy v. Louisiana State Bd. of Education, 5 Cir., 1964, 332 F.2d 915
 
 
 [12]
 Of course an unsuccessful plaintiff may file an amended complaint to cure deficiencies. But we have held that this is permissive and need not be done to invest finality in the order of dismissal. United Steelworkers of America, AFL-CIO v. American International Aluminum Corp., 5 Cir., 1964, 334 F.2d 147; Due v. Tallahassee Theaters, Inc., 5 Cir., 1964, 333 F.2d 630
 
 
 [13]
 Similar analysis disposes of the contention that the defendant registrars are not proper parties appellee. See also United States v. Wood, 5 Cir., 1961, 295 F.2d 772, which illustrates a situation where a party appellee was not even a party below
 
 
 [14]
 Hearings Before the House Committee on the Judiciary on H.R. 10327, 86th Cong., 2d Sess. 13
 
 
 [15]
 The following colloquy between Senator McClelland and Mr. Walsh is found in Hearings Before the Senate Committee on the Judiciary on H.R. 8601, 86th Cong., 2d Sess. 68:
 'SEN. McCLELLAN: Now, what constitutes a pattern?
 'MR. WALSH: A pattern of discrimination would be discrimination that was widespread beyond an individual case. It would be the burden to be carried by the Attorney General which would be to prove this was the usual rather than the unusual situation.
 'SEN. McCLELLAN: What constitutes a practice?
 'MR. WALSH: Practice would be very much the same thing. Not only was it usual but it has been indulged-- I mean the words have their generic meaning; there is no word of art involved.
 ' * * * *: P
 'SEN. McCLELLAN: To establish a practice there wouldn't there have to be repeated acts?
 'MR. WALSH: I think that would be the general sense of it; yes, sir.'
 
 
 [16]
 106 Cong.Rec. 7223
 
 
 [17]
 This record does not present the question involved in United States v. Ramsey, 5 Cir., 1964, 331 F.2d 824, rehearing granted in part (April 23, 1964) whether the pattern or practice finding of the District Court is clearly erroneous, F.R.Civ.P. 52(a). Were we faced with the problem, we would hold that the finding of pattern or practice of discrimination is compelled. The acts of discrimination were not isolated incidents. They had taken place over a period of years. See United States v. Manning, W.D.La., 1962, 205 F.Supp. 172, 174. The conduct of the defendant-Registrars found to have taken place and enjoined was the kind which the legislative history indicates would constitute a pattern or practice. For example, the decree enjoined the Registrars from 'failing to meet, receive, and process applications for registration to vote * * *.' Senator Keating explained that 'if State registration officials attempted to frustrate Negro enrollment by failing to hold registration sessions, such derelictions of duty would constitute a pattern or practice.' 106 Cong.Rec. 7767
 
 
 [18]
 S.Rep.No. 1205, 86th Cong., 2d Sess. 2 (1960), 2 U.S.Code Cong. and Adm.News 1960, p. 1926
 
 
 [19]
 Civil Rights Act of 1960, 601(a), 74 Stat. 86, 90, 42 U.S.C.A. 1971(e)
 
 
 [20]
 See Alabama v. United States, 5 Cir., 1962, 304 F.2d 583, 592, aff'd mem., 1962, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112; United States v. Manning, W.D.La., 3-Judge, 1963, 215 F.Supp. 272, 290
 
 
 [21]
 42 U.S.C.A. 1971(e) provides in part:
 'If the court finds such pattern or practice, any person of such race or color resident within the affected area shall, for one year and thereafter until the court subsequently finds that such pattern or practice has ceased, be entitled, upon his application therefor, to an order declaring him qualified to vote, upon proof that at any election or elections (1) he is qualified under State law to vote, and (2) he has since such finding by the court been (a) deprived of or denied under color of law the opportunity to register to vote or otherwise to qualify to vote, or (b) found not qualified to vote by any person acting under color of law.'
 
 
 [22]
 United States v. Manning, W.D.La., 3-Judge, 1963, 215 F.Supp. 272, 290 and cases there cited
 
 
 [23]
 Alabama v. United States, 5 Cir., 1962, 304 F.2d 583, 593, aff'd mem., 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112
 
 
 [24]
 Hearings Before the House Committee on the Judiciary on H.R. 10035, 86 Cong., 2d Sess. 28
 
 
 [25]
 'In a proceeding before a voting referee, the applicant shall be heard ex parte at such times and places as the court shall direct.' Further provisions indicate the simplified means of proof of his entitlement to an order that are available to the applicant
 
 
 [26]
 It is no justification for rejection of the applications that in the August 16 order the Judge, with perhaps the likelihood of a future contempt decree in mind, directed the Registrars to provide him with information as to the 77 August 6 letter-writers who were ordered processed in the order of May 17. Once the Court has found in the subsection (c) suit that discrimination is due to a pattern or practice, persons subsequently discriminated against need not try again and again to register at the State voter registration office. They are given the right to seek an order accomplishing the same thing from a United States District Judge. And when they do, the the statute requires the Judge to treat the application as such and process it under the 1971(e) procedures. The Court may in the meantime employ fully the contempt powers to secure compliance with its orders. And such supplemental, collateral proceedings might bring about registration of all or some of the applicants, thus making it unnecessary for the Judge (or a Referee) to go clear through the application procedure
 
 
 [27]
 Federal habeas corpus in behalf of state prisoners, 28 U.S.C.A. 2241, has imposed like burdens on District Courts in certain Districts as this law continues to develop. Following the lead of the Judges of the Northern District of Illinois whose experimental improvisation produced a workable questionnaire-type petition which is now mandatory under implementing local rules, many other Districts are now adopting variations of this approach both for state habeas corpus and 2255 federal prisoner cases. See Habeas Corpus and Post Conviction Review, 33 F.R.D. 363, 391
 
 
 [28]
 Indeed, there is nothing to keep a Judge, aware that voter applications are likely to flow from his pattern-or-practice finding, from promulgating a simple application form for initial use (see note 29, infra) thereby eliminating the problem of formal 'sufficiency' of the application
 
 
 [29]
 By an appendix to its brief, the Government has included a formal 'Voting Referee's Manual' for possible use by voter Referees appointed by District Courts, together with a step-by-step outline of procedures to be followed with or without the voter Referee system. Included is a suggested printed post card form of application for an order of qualification to vote. Addressed on the front side to the District Clerk's office at the place concerned, the card carries on the reverse side instructions and spaces to reflect the specific answers of the applicant:
 INSTRUCTIONS
 Who May Apply
 If you are a Negro citizen and reside in ........................................,
 AND have tried to apply for registration to vote there since ..........,
 AND did not become registered,
 you may fill out the application on the attached post card and send it in.
 How To Apply
 Fill out the application on the attached post card.
 
 
 [1]
 Check the statement which is true
 
 
 [2]
 Print your name and address clearly
 
 
 [3]
 Sign your name on the line marked 'X.'
 
 
 [4]
 Write the date at the bottom
 TEAR OFF THESE INSTRUCTIONS, PUT A STAMP ON THE CARD, MAIL THE CARD
 To: The United States District Court
 I hereby apply to the Court for an Order declaring me qualified to vote in ..................................................
 I am a Negro citizen of the United States. I am 21 years old or older and I reside in .............................. I believe I am qualified to vote. Since this Court's Order and Decree I have not been allowed to register to vote because:
 CHECK One:
 ( ) My application was rejected. ( ) I have not been told whether my application was accepted or rejected. ( ) The registration officials did not allow me to apply. ( ) The registration office was closed during the regular hours. ( ) There is no local registration officer to take my application.
 My full name is ..............................
 (Please print)
 My mailing address is .........................
 (Please print)
 X..................................................
 (Signature)
 Date ............... GPO 652776-h
 This form, although proposed as an initial application blank, could readily be adapted as a questionnaire-form after the filing of the written application with the Clerk.
 Also, in response to inquiries from the bench during argument, the Government has submitted at our request a possible questionnaire form for situations in which the written application is 'legally sufficient' but lacking in detail. The following form of transmittal letter and questionnaire is suggested:
 THE UNITED STATES DISTRICT COURT FOR THE ..... DISTRICT OF .....
 Dear Mr. ....................:
 This Court has received your letter asking to be registered to vote in .......... County. This Court needs more information before it can act on your request. Please fill in answers to the questions below and return this paper to the Clerk of this Court in the enclosed self-addressed envelope.
 Sincerely,
 CLERK, UNITED STATES DISTRICT COURT
 QUESTIONNAIRE
 
 
 [1]
 Your name
 
 
 [2]
 Your address
 
 
 [3]
 Your race
 
 
 [4]
 Have you tried to register to vote in your county?
 ( ) yes ( ) no
 
 
 [5]
 When did you try to register to vote in your county?
 
 
 [6]
 Did you fill out a registration form?
 ( ) yes ( ) no
 
 
 [7]
 Did you get registered?
 ( ) yes ( ) no
 
 
 [8]
 If you did not fill out a registration form, give the reasons
 
 
 [30]
 In so doing we hold that the contentions that the 1971(e) procedures (1) are lacking in due process and (2) unconstitutionally require the District Judge to exercise nonjudicial functions are wholly without merit. Judge Wisdom's opinion for the 3-judge court in United States v. Manning, W.D.La., 3-judge, 1963, 215 F.Supp. 272, adequately disposes of both contentions. Construction of the statute to require the same procedural safeguards to be observed by the Judge when he handles applications as are provided in the Referee machinery disposes of the due process contentions, and the able opinion of Judge Wisdom unanswerably demonstrates that the function given the Judge under 1971(e) is judicial in nature. See also Kennedy v. Lynd, 5 Cir., 1962, 306 F.2d 222, 225, and cases there cited