**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**WEST PEACHTREE TENTH CORPORA-**
**TION d/b/a One Tenth Street Apart-**
**ments et al., Defendants-Appellees.**

**No. 29431.**

United States Court of Appeals,
Fifth Circuit.

Jan. 4, 1971.

John W. Stokes, Jr., U. S. Atty., Jerris Leonard, Asst. Atty. Gen., Dept. of Justice, Civil Rights Div., Frank E. Schwelb, Chief, Michael J. Hoare, Atty., Housing Sec., Civil Rights Div., Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Maurice N. Maloof, Paul Hanes, Atlanta, Ga., for defendants-appellees.

Before JOHN R. BROWN, Chief Judge, and DYER and INGRAHAM, Circuit Judges.

DYER, Circuit Judge:

■ The United States brought a civil action against appellee, West Peachtree Tenth Corporation, for an alleged pattern or practice of racial discrimination in the rental of housing in violation of the Fair Housing Act of 1968, 42 U. S.C.A. § 3601 et seq.[1] In a trial without

---

1. 42 U.S.C.A. § 3604 provides in pertinent part:

As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, or national origin.

jury, the district judge found that appellee had engaged in a program of restriction in rentals which effectively excluded blacks before the effective date of the Act, but that the Government had failed to establish a "pattern or practice" of discrimination after the effective date of the Act, as required by 42 U.S.C.A. § 3613. We reverse.

Appellee operates the One Tenth Street Apartments, a 96-unit high-rise in downtown Atlanta. The units range in price from $139 to $186 per month. Mr. Ted Levy, a majority stockholder and President of the Corporation, has general responsibility for operation of the apartments. Mrs. Francis Price, acting under Mr. Levy's authority, manages the apartments, maintains the rental office, and hires and supervises night managers and part-time rental clerks.

All interested prospective tenants are required to complete a written application indicating: (1) present residence and landlord, (2) occupation and place of employment, (3) former employers, (4) two character or personal references, (5) two credit references, and (6) price range or rental unit desired.

If there is no vacancy in the price range sought, the application is placed in a "pending" file in no particular order. When a vacancy occurs, it may be filled by a new application or by one of the pending applications, but no preference is given to pending applications.

Unless a rental applicant is personally known to Mrs. Price or is referred to her by a personal friend or is a prior tenant, it is a non-uniform practice to require a security deposit before the application will be processed, *i. e.*, before references are checked out and other information in the application is verified. In each instance, Mrs. Price or one of her rental clerks conducts an interview with the applicant.

The apartment has a continuing policy against admission of drunks, hippies, children and belligerent appearing applicants. As the trial judge found,

> there is considerable subjective decision by Mrs. Price in rentals. While such a procedure appears necessary and practical on the part of management in order to keep undesirables of any race out of the building, it does

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, or national origin.

(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, or national origin, or an intention to make any such preference, limitation, or discrimination.

(d) To represent to any person because of race, color, religion, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

42 U.S.C.A. § 3613 provides:

Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a *pattern or practice* of resistance to the full enjoyment of any of the rights granted by this subchapter, or that any group of persons has been denied any of

the rights granted by this subchapter and such denial raises an issue of general public importance, he may bring a civil action in any appropriate United States district court by filing with it a complaint setting forth the facts and requesting such preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for such pattern or practice or denial of rights, as he deems necessary to insure the full enjoyment of the rights granted by this subchapter (emphasis added).

Relying on Jones v. Alfred H. Mayer Co., 1968, 392 U.S. 409, 88 S.Ct. 2186, 20 L. Ed.2d 1189, the Government also contends that appellee violated the Civil Rights Act of 1866, 42 U.S.C.A. § 1982. Since the Government did not make this assertion during the trial, *Jones* is not applicable here. An action under the Fair Housing Act does not necessarily encompass a suit under the Act of 1866, and vice versa. 392 U.S. at 413–414, 88 S.Ct. 2186; *see* Sullivan v. Little Hunting Park, 1969, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386.

create the "opportunity" for discrimination in rentals.

Based on the application, the character and credit checks, and the interview, the management decides whether to accept or reject the applicant.

Since appellee opened its doors in 1965, it has received approximately 850 written applications, twelve of which were made by blacks. While appellee rented to some 400 white tenants, it never admitted a black tenant prior to the filing of this suit on June 26, 1969.[2] Nine blacks made applications in 1968 and 1969.[3]

### Pre-Act black applicants

During 1968, appellee received five applications from blacks. All applicants were college graduates, and all were employed. After completing applications, they were told either that there were no vacancies or that they would be notified later, or they were instructed to call back. None of the applicants were contacted again and those who called back were told either that they had been rejected or that still no vacancies existed. Four of these applicants were never advised that a security deposit was required before their applications would be processed.[4] One of the applicants, Robert Pitts, told the management that he wanted to leave a $20 deposit if it would improve his chances. While the management did accept the deposit, none was requested.

The word "Colored" or the letters "C" or "N" were placed on three of the applications. The trial judge specifically found, and appellee does not challenge, that "[p]rior to the effective date of the Act on January 1, 1969, there existed at the defendant apartment a program of restrictions in rentals which effectively excluded Negroes." For example, after several fruitless phone calls and a second visit to the rental office, Pitts returned again to check on his application. This time appellee admitted to him that he had been rejected because the owners had not yet permitted integration of the apartment. In contrast, many whites were admitted during 1968 with little or no delay.

### Post-Act black applicants

In 1969, two of the previous applicants, Robert Pitts and Sandra Threadcraft, reinquired or reapplied. Additionally, for the first time, four other blacks submitted applications, only two of which warrant discussion.[5]

On January 15, 1969, three months after Pitts was rejected because of the apartment's policy of racial discrimination, he telephoned the rental office and asked if there had been any change in his "status." Appellee replied, "No." Thereafter Pitts made no further contact with the apartment.

Miss Threadcraft reapplied in May 1969 and was advised that "possibly" her application was rejected on account of credit and/or lack of a security deposit. She then revisited the rental office, gave additional credit references, and demanded that a credit report be obtained. Both sides continued to display mutual hostility. Finally, Threadcraft was told that no vacancies existed but that she would be contacted shortly.

2. The appellee admitted a black, Jim Brown, in July 1969, nearly one month after this suit was filed. In fact, Brown did not submit his application until after suit was commenced. We are concerned here with events which occurred before suit was filed.

3. No evidence was introduced as to any details of three other applications by blacks.

4. As to Miss Threadcraft, the trial judge made no finding on this point, and the evidence is conflicting.

5. Jim Brown applied after suit was filed. Also, Miss Barbara Story visited the rental office and was shown an apartment. She told the management to "hold" until she checked with her roommate and, if interested, she would return. She did not return, and she did not contact appellee further. The Government does not contend that appellee discriminated against Miss Story.

After hearing nothing for two weeks, she called back and was told that she had been rejected.

John Lloyd also applied in May 1969 and was told that there were no vacancies but that he would be contacted. After hearing nothing, he called back and was told that he was rejected. The trial court found that he was justifiably rejected, since he had six children and the apartment was unable to get any credit information pertaining to him.

On June 26, the same day this suit was filed, Franklin Biggins applied for an apartment. Biggins was not advised of the deposit requirement. Although no apartments were available in his requested price range, he was told that there might be vacancies later and that he would be called.

Again, in contrast to the black applicants, some whites were admitted with little or no difficulty.

*The Court's findings*

■ The District Court found that *before* an applicant is advised of the security requirement he must meet certain objective requirements,[6] including the financial ability to satisfy rental obligations under the lease. This finding is clearly erroneous under Rule 52(a), Fed.R.Civ.P. It is clear from the record that in almost every instance these criteria were not even considered *until* the applicant submitted a security deposit. Appellee repeatedly testified without contradiction that any person interested in an apartment is always advised that a security deposit is required, even if he "actually talks funny or looks funny." Furthermore, unless the applicant is known to Mrs. Price, is referred to her by a personal friend, or is a prior tenant, he must submit a security deposit *before* his application is processed. In other words, appellee's policy was to refrain from processing an application *un-*

*til* the applicant submitted a security deposit. This distinction is critical in view of the fact that many blacks were not advised of the deposit requirement; thus, their applications were shelved without further consideration or processing by the management. In light of this chronology, however sure the trial court may have been that its finding was correct, we cannot approve, because the undisputed testimony is to the contrary. Janigan v. Taylor, 1 Cir. 1965, 344 F.2d 781, 784, cert. denied, 1965, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120; *see* Moore v. Chesapeake & Ohio Ry., 1951, 340 U.S. 573, 576–577, 71 S.Ct. 428, 95 L.Ed. 547.

■ The District Court also found that Pitts was not subjected to discrimination after the effective date of the Act, since he did not formally reapply for an apartment in 1969. However, the Government points out that Pitts, having been rejected in 1968, again called Mrs. Price in 1969 and was informed that his status had not changed. According to the Government, Mrs. Price's response can only be interpreted as an admission that the management's policy of racial discrimination remained in effect. It taxes credulity to conclude otherwise. The trial court placed mistaken importance on whether Pitts' 1969 call constituted a reapplication. It is clear that during the conversation he was discouraged from making another offer to rent an apartment; telling him that his status remained unchanged was tantamount to saying that in view of the management's continuing policy of segregation, any reapplication would be fruitless. Thus it was not necessary for Pitts to formally renew his application, or otherwise make a bona fide offer to rent. This Court is in substantially as good a position as the District Court to draw inferences and conclusions from the 1969 phone conversation between

6. These requirements are: (1) that the tenant has the financial ability to meet rental obligations under the lease, (2) that the tenant will take care of the apartment unit, and (3) that the tenant will not create a nuisance to other tenants or management.

Pitts and Mrs. Price. Daniel v. First National Bank of Birmingham, 5 Cir. 1956, 228 F.2d 803, 805; *see* Galena Oaks Corp. v. Scofield, 5 Cir. 1954, 218 F.2d 217.

■ The Government also argues that appellee discriminated against John Lloyd. In view of the conflicting testimony concerning Lloyd's treatment, due regard must be given to the trial court which had an opportunity to assess the witnesses' credibility. Rule 52(a), Fed. R.Civ.P.; *see* Bryan v. Kershaw, 5 Cir. 1966, 366 F.2d 497, 499, cert. denied, 1967, 386 U.S. 959, 87 S.Ct. 1030, 18 L. Ed.2d 108. The trial judge accepted appellee's contention that it rejected Lloyd because the management was unable to verify his credit and because he had too many children. These findings were not clearly erroneous.

We pretermit discussion of appellee's contention that Threadcraft's rejection was based solely on a credit check, since appellee does not challenge the finding that Threadcraft was told no vacancy existed when in fact an apartment was available. 42 U.S.C.A. § 3604(d).

This Court must determine the correctness of the District Court's finding that no post-Act pattern or practice of discrimination existed. United States v. Fox, 5 Cir. 1964, 334 F.2d 449, 453. Appellee, however, urges that we are bound by the clearly erroneous rule in reviewing the District Court's finding that the Government failed to establish a pattern or practice of racial discrimination in rentals after the effective date of the Act, January 1, 1969. This finding was based primarily on an accompanying finding that appellee committed only a single isolated act of discrimination—*i. e.,* the Threadcraft incident. This latter finding is clearly erroneous in view of our conclusion that Pitts too was subjected to discrimination in a *manner which manifested a continuing discriminatory policy* after the effective date of the Act. Furthermore, in finding no pattern or practice, the trial court relied partly on its finding that

Story's application was *processed* without regard to race. Nevertheless, the evidence clearly indicates that Story's application never reached the processing stage, since she never manifested a serious interest in renting an apartment. Thus, even assuming *arguendo* that application of the clearly erroneus rule is necessary, it becomes clear that the District Court's ultimate finding of no post-Act pattern or practice—based substantially on the erroneous preliminary findings discussed above—was itself clearly erroneous. We are "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746; Daniel v. First National Bank of Birmingham, *supra,* 228 F.2d at 805.

*Significance of an established pre-Act "pattern or practice".*

Our decision is not founded solely on the Government's evidence of post-Act discrimination. In the factual context of this case, we need not so limit our consideration. The Government relies on a series of labor discrimination cases, including United States v. Sheet Metal Workers, Intern. Ass'n, Local Union No. 36, 8 Cir. 1969, 416 F.2d 123, decided under the Fair Employment Practices Act, 42 U.S.C.A. §§ 2000e to 2000e–15, to support the proposition that there need be no showing of an independent post-Act pattern or practice. In *Sheet Metal Workers,* however, pre-Act exclusions of blacks from the unions directly resulted in blacks not being hired after the effective date of the Employment Practices Act since persons with union experience were given priority. The post-Act priority system utilized by the unions functioned as a "grandfather clause" which effectively prevented blacks from being hired due to their race and, in effect, perpetuated or carried forward the pre-Act discriminatory practice, even though there were no post-Act refusals of black applicants as such for union membership.

■ In the case before us, no "grand-father clause" device nor anything analogous to it was employed. Appellee's pre-Act refusals to rent to Pitts and Threadcraft did not mandate their rejections in 1969. No priority system was applied to the apartment's applicants. However, *Sheet Metal Workers* is relevant here in at least one aspect. When there is a finding of a pre-Act pattern or practice of discrimination, and little or no evidence indicates a post-Act change in such pattern or practice up to the time suit is filed, a strong inference that the pre-Act pattern or practice continued after the effective date of the Act arises. *Id*. at 127. Such evidence alone does not create a *prima facie* case of post-Act pattern or practice, but it is of significant probative value. *See* Local Lodge No. 1424 v. NLRB, 1960, 362 U.S. 411, 416, 80 S.Ct. 822, 4 L.Ed.2d 832; FTC v. Cement Institute, 1948, 333 U.S. 683, 705, 68 S.Ct. 793, 92 L.Ed. 1010; United States v. Fox, *supra*; United States v. Duke, 5 Cir. 1964, 332 F.2d 759, 766; United States v. Lynd, 5 Cir. 1963, 321 F.2d 26, 28, cert. denied, 1964, 375 U.S. 968, 84 S.Ct. 486, 11 L. Ed.2d 416; Kennedy v. Lynd, 5 Cir. 1962, 306 F.2d 222, 228, cert. denied, 1963, 371 U.S. 952, 83 S.Ct. 507, 9 L. Ed.2d 500. *Cf*. Patton v. Mississippi, 1947, 332 U.S. 463, 466, 68 S.Ct. 184, 92 L.Ed. 76; Hill v. Texas, 1942, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559. In the instant case there were at least two post-Act discriminatory rejections; in *Sheet Metal Workers* there were no post-Act refusals to hire. Thus the inference should be even more compelling here.

### Post-Act "pattern or practice"

We turn now to the question whether the 1969 acts of discrimination against Pitts and Threadcraft were isolated incidents or part of a pattern or practice of discrimination under the Fair Housing Act of 1968. The Act does not define "pattern or practice", and the phrase is not explained by the legislative history. Relevant, however, are judicial and leg-islative interpretations of the phrase under earlier civil rights acts, such as the Civil Rights Act of 1960, 42 U.S.C.A. § 1971(e). The words "pattern or practice" were not intended to be esoteric words of art. There is nothing magic in their meaning. United States v. Mayton, 5 Cir. 1964, 335 F.2d 153, 158–159. To be sure, they were intended to encompass more than an "isolated or accidental or peculiar event." *See* Hearings on H.R. 10327 Before the House Committee on the Judiciary, 86th Cong., 2d Sess. 13; United States v. Mayton, *supra*, at 158–159.

■ The number of blacks actually turned away or discriminated against is not determinative. United States v. Ramsey, 5 Cir. 1964, 331 F.2d 824, 837 (concurring opinion). Nevertheless, we do note that in a case brought under the Act involving "blockbusting," three § 3604 violations were sufficient to establish a pattern or practice. United States v. Mintzes, D.Md.1969, 304 F. Supp. 1305, 1314–1315. In any event, no mathematical formula is workable, nor was any intended. Each case must turn on its own facts.

■ Appellee's admission to Pitts before the effective date of the Act that it had a policy of discrimination and its statement to the same applicant after the effective date of the Act that his "status" remained unchanged comprise evidence of a post-Act "pattern or practice." See United States v. Duke, *supra*.

Moreover, the failure to advise many black applicants of the security deposit prerequisite to consideration of their applications was discriminatory. Incidents of such discrimination occurred both before and after the effective date of the Act. As a matter of established policy, except in certain circumstances explained *supra*, appellee does not process applications until a deposit is submitted by the applicant. In 1968, however, three of the black applicants were not advised of the deposit requirement; there was no finding as to the fourth, Miss Threadcraft. In 1969, two appli-

cants were not advised. As to the remaining black applicants, there was no finding. In contrast, whites were admitted with little or no delay, and in some instances the deposit requirement was waived or no credit check was made.

We do not question the legitimacy of requiring a deposit before a prospective tenant's application is processed. An apartment owner or manager absorbs considerable time and expense verifying information in an application and in checking personal and credit references. If the applicant is not really serious about renting in a particular instance, this time and expense will have been wasted. Mrs. Price testified that if an applicant does not leave a deposit, she assumes that he is not interested, and the application is placed in a "dead file" without being processed.

Generally the justification for a security deposit is that it is good business practice. But in this case, the facially neutral deposit requirement served yet another function—an excuse not to process the applications of many blacks. Appellee's assertion that the deposit requirement was not conceived out of racial discrimination is of no avail, since the requirement was administered in a discriminatory manner. Failure to advise these applicants of the deposit requirement was a disingenuous scheme or device to exclude blacks from the apartments and is additional evidence of a post-Act pattern or practice of racial discrimination.

*Summary*

The post-Act discriminations against Pitts and Threadcraft, the admission to Pitts that the apartment's policy of maintaining a segregated apartment continued into 1969, the failure to advise several of the post-Act applicants of the deposit requirement, and the absence of persuasive indications that a cessation in an admitted pre-Act pattern or practice occurred establish a pattern or practice of racial discrimination in renting after the effective date of the Act.

*Order and decree*

■ Appellee's argument that the Court is limited to issuing an injunction in granting relief under 42 U.S.C.A. § 3613 is without merit. In Alabama v. United States, 5 Cir. 1962, 304 F.2d 583, aff'd, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed. 2d 112, a suit under the Civil Rights Act of 1960, 42 U.S.C.A. § 1971 et seq., the defendant raised the same argument with reference to a provision of that Act which provided for "a permanent or temporary injunction, restraining order, *or other order.*" 42 U.S.C.A. § 1971(c) (emphasis added). The portion of § 3613 which appellee here seeks to limit is identical in wording. In *Alabama*, this Court held that the phrase "or other order" includes the power to grant affirmative relief. *Id.* at 590. Indeed, the federal courts are fully empowered to eliminate the present effects of past discrimination. Local 53, of Intern. Ass'n of Heat and Frost Insulators and Asbestos Workers v. Vogler, 5 Cir. 1969, 407 F.2d 1047, 1052–1053 See also Louisiana v. United States, 1965, 380 U. S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709; Textile Workers Union of America v. Lincoln Mills, 1957, 353 U.S. 448, 451, 460, 77 S.Ct. 912, 1 L.Ed.2d 972; Porter v. Warner Holding Co., 1946, 328 U.S. 395, 399, 66 S.Ct. 1086, 90 L.Ed. 1332; Bell v. Hood, 1946, 327 U.S. 678, 66 S. Ct. 773, 90 L.Ed. 939.

■ Moreover, the good faith and present disposition of the defendant to adhere to the letter and spirit of the law does not preclude us from granting relief. *See* United States v. Atkins, 5 Cir. 1963, 323 F.2d 733, 739; cf. United States v. Oregon State Medical Society, 1952, 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978. *See also* United States v. Indianola Municipal Separate School District, 5 Cir. 1969, 410 F.2d 626, 631, cert. denied, 1970, 396 U.S. 1011, 90 S.Ct. 571, 24 L. Ed.2d 503; Local 53 of Intern. Ass'n of Heat and Frost Insulators and Asbestos Workers v. Vogler, *supra*, 407 F.2d at 1051. However, to minimize federal intrusion and to assure that defendants be

permitted to retain maximum control of their business operations consistent with the assurance of equal housing opportunities for all persons without regard to race, color, religion or national origin, we will require the defendant to submit to the District Court for approval proposed objective standards and criteria for processing and approval of applications for apartments.

We therefore order the District Court to enter a decree in accordance with Appendix A attached to this opinion.

Reversed and remanded for further proceedings not inconsistent herewith.

## APPENDIX A.

In the United States District Court for the Northern District of Georgia

United States of America,

Plaintiff,

versus

West Peachtree Tenth Corporation d/b/a One Tenth Street Apartments, et al., Defendants.

Pursuant to the Opinion and Mandate of the United States Court of Appeals for the Fifth Circuit,

It is ordered, adjudged and decreed by this court that the defendant, West Peachtree Tenth Corporation, its officers, employees, agents and successors, and all persons in active concert or participation with any of them are permanently enjoined from:

(1) Failing or refusing to rent a dwelling to any person because of race, color, religion, or national origin and from making a dwelling unavailable to any person because of race, color, religion, or national origin;

(2) Discriminating against any person in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, or national origin;

(3) Making, printing, or publishing, or causing to be made, printed, or published, any notice, statement, or advertisement, with respect to the rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, or national origin or an intention to make such preference, limitation, or discrimination;

(4) Representing to any person because of race, color, religion, or national origin that any dwelling is not available for inspection or rental when such dwelling is in fact available.

It is further ordered that the defendants shall forthwith adopt and implement the following affirmative program to correct the effects of their past discriminatory practices:

(1) Within ten (10) days of this Order, defendants shall notify the following black applicants for housing at One Tenth Street Apartments, by registered mail with copies to counsel for plaintiff, that each is entitled to reapply for an apartment and that any reapplication will be considered without regard to race or color:

ROBERT PITTS

SANDRA THREADCRAFT

(2) Within ten (10) days of this Order, defendants shall permanently post in a prominent place in the rental office, or immediately outside the rental office, a notice, clearly visible to applicants, stating that the One Tenth Street Apartments will be rented without regard to race, color, religion, or national origin.

(3) All advertising of apartments at One Tenth Street Apartments in newspapers or other media, or in pamphlets, brochures, handouts, or writings of any kind, shall include a statement to the effect that apartments are rented without regard to race, color, religion, or national origin.

(4) The defendants shall forthwith fully instruct all of their full-time and part-time employees with respect to the provisions of this decree and with respect to their obligations thereunder. Within five (5) days of hiring of any new employees, defendants shall provide

each employee with a copy of this decree, explain its contents to him and advise him that he is subject to all the requirements contained therein.

(5) In the event that a firm, association, company, corporation or other person is engaged by defendants to act as a real estate agent, referral agency, or otherwise manage or promote rentals of apartments for the defendant, such firm, association, company, corporation, or person shall be notified by defendant within five (5) days of its engagement that apartments are rented without regard to race, color, religion, or national origin.

It is further ordered that, no later than fifteen days after the entry of this Order, the defendants * shall file with the Court, and serve upon counsel for plaintiff, proposed written objective nonracial standards and criteria (hereinafter referred to as standards or proposed standards) for the processing and approval of applications for apartments at the One Tenth Street Apartments. It is suggested that, in formulating proposed standards, the defendants consider the standards approved by the United States District Court for the Eastern District of Louisiana in

United States v. Palmetto Realty Corp., C.A. No. 70–1419 (E.D.La., September 18, 1970) (See paragraph II c of decree and Policies and Procedures, Rules and Regulations attached thereto)

The plaintiff shall have ten days after the filing of such proposed written objective nonracial standards and criteria by the defendants to object to the same. In the event plaintiff files such objections, this Court will hold a prompt hearing with respect to the adequacy of the defendants' proposed standards, and with respect to the merits of plaintiff's objections thereto, and will order the implementation of objective standards and procedures either as proposed by the de-

fendants or otherwise. Upon the entry of an Order approving or requiring the implementation of objective standards and criteria, the defendants shall forthwith implement such standards and criteria with respect to all applicants for apartments, without regard to race, color, religion, or national origin.

If, following the entry of an order requiring the implementation of objective standards, the defendants should elect to alter such standards for the processing and approval of applications for apartments, by making changes therein which are nonracial both in purpose and in effect, they shall promptly file such proposed changes with the Court, with copies to counsel for plaintiff, and the plaintiff shall have the opportunity to object thereto. Any dispute between the parties arising from such proposed changes may be raised by either party in any subsequent appropriate proceeding in this Court.

It is further ordered that ninety days after the entry of this decree, and at three-month intervals thereafter, for a period of two years following the entry of this decree, the defendants shall file with this Court, and serve on counsel for the plaintiff, a report containing the following information for the One Tenth Street Apartments:

(a) The name, address and race of each person making inquiry about the availability or terms of rental of an apartment during the preceding three-month period, and whether such person:

    1. Made inquiry.

    2. Was offered an application.

    3. Filled out an application.

    4. Submitted an application.

    5. Was advised with respect to earnest money and security deposit procedures.

    6. Made a deposit.

---

* For purposes of convenience, the terms "defendant" or "defendants", as used in the remainder of this Order, shall include persons in privity with the named defendant or defendants, including officers, employees, agents, successors, and all persons acting in concert with any of them.

7. Was accepted for a waiting list.

8. Was accepted for occupancy.

9. Was rejected, and if rejected, the reason or reasons therefor, and the specific objective criterion which the applicant failed to meet.

The report shall also state the date on which each of the foregoing actions was taken.

The reports filed pursuant to this Order shall also include a description of all affirmative steps taken during each preceding reporting period in compliance with this decree, including copies of letters to Negro applicants, copies of all signs posted in accordance with this Decree, copies of all advertisements and brochures used by the defendants (or sample copies of advertisements, together with the dates and media in which they were published), and written documentation to the effect that each employee has received a copy of this Order and has been advised of its terms. The parties are directed to attempt to agree on simplified forms and procedures for carrying out this reporting provision to assure minimum inconvenience to all parties and to the Court.

For a period of two years following the entry of this decree, the defendants shall maintain and retain any and all records which are the source of, or contain, any of the information pertinent to defendants' obligation to report to the Court. Representatives of the plaintiff shall be permitted to inspect and copy all pertinent records of the defendants at any and all reasonable times, provided, however, that the plaintiff shall endeavor to minimize any inconvenience to the defendants from the inspection of such records.

The plaintiff shall recover of the defendants its costs.

The Court retains jurisdiction of this action for all purposes.

United States District Judge

ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.