**UNITED STATES of America, Plaintiff,**

v.

**Alvin GILMAN and Mitchell Eisen, d/b/a Gilman-Eisen Co., Defendants.**

**No. 70 Civ. 1967.**

United States District Court, S. D. New York.

March 22, 1972.

Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., for plaintiff; Yale L. Rosenberg, David P. Land, Asst. U. S. Attys., of counsel.

Gilberg & Gilberg, Mount Vernon, N. Y., for defendants; David C. Gilberg, Mount Vernon, N. Y., of counsel.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEVET, District Judge.

In this action the United States of America seeks injunctive relief against the above-named defendants Alvin Gilman (hereinafter "Gilman") and Mitchell Eisen (hereinafter "Eisen"), doing business as Gilman-Eisen Co., for alleged violations of Title VIII of the Civil Rights Act of 1968 (82 Stat. 81), 42 U.S.C. § 3601 et seq. The "dwellings" involved are 555 McLean Avenue, Yonkers, New York and 2–4 Windsor Terrace, White Plains, New York. (¶ 3.) The accusation against defendants is that they follow a policy and practice of racial discrimination against blacks at said premises in making statements indicating that "apartments will not be rented to Negroes," "representing to Negroes that apartments are unavailable for rental when apartments are in fact available" and "discriminating against Negroes in the terms and conditions of rental" which "constitute (a) a pattern and practice of resistance by defendants to the full enjoyment of rights guaranteed by Title VIII of the Civil Rights Act of 1968 and (b) a denial by defendants to a group of persons of the rights guaranteed by Title VIII of the Civil Rights Act of 1968 which denial raises an issue of general public importance."

On the settlement of the pretrial order the government amended its complaint to include (a) as an additional "dwelling" where defendants allegedly engaged in discriminatory practices prohibited by the Civil Rights Act of 1968, premises 175 Hawthorne Street, Brooklyn, New York, and (b) by defendants' refusing to rent apartments to bona fide black offerees because of their race and color. (Pretrial order, p. 3–(i).)

## PLAINTIFF'S CLAIMS

In the pretrial order it is stated:

"The Government alleges that the defendants, their agents and employees, acted unlawfully by:

"(i) refusing to rent apartments to bona fide black offerees because of their race and color, in violation of 42 U.S.C. § 3604(a);

"(ii) discrimination against black persons in the terms and conditions of rental, in violation of 42 U.S.C. § 3604(b);

"(iii) making statements indicating their preference to rent apartments to white persons and their intention to discriminate against black persons, in violation of 42 U.S.C. § 3604(c); and

"(iv) representing that there were no vacancies when in fact vacancies did exist, for the purpose of discriminating against black persons, in violation of 42 U.S.C. § 3604(d)."

In the pretrial order in this case, page 3, the government alleged that the defendants, their agents and employees acted unlawfully in respect to four different claims in violation of Title 42 U.S.C. § 3604(a), (b), (c) and (d) respectively.

Based upon a letter from Assistant United States Attorney Rosenberg, dated January 7, 1972, I have stated the statutory basis of each claim in the respective findings herein.

I find no statement by counsel for the government that any claim is made under item (iv) of the pretrial order. (42 U.S.C. § 3604(d).)

## DEFENSES

In addition to general denials the answer pleads that the complaint fails to state a cause of action (first defense); that the action does not lie as to any acts antedating the applicable Civil Rights Act (second defense); that res judicata and estoppel based on proceedings in other courts of competent jurisdiction is applicable (third defense).

*The first defense*, i. e., that the complaint fails to state a claim against defendants upon which relief can be granted, must be dismissed. However, in considering the proof adduced I have in each instance determined whether such proof is sufficient under the Act and have ruled accordingly.

*The second defense*, i. e., that the facts forming the basis of the complaint antedate the effective date of the statute and could affect only the claim relative to the McKeever-Brown sublease (finding 22), has no merit. Since I have found no merit in this claim irrespective of the date of effectiveness, it is unnecessary to consider this defense.

*The third defense*, i. e., in respect to res judicata and collateral estoppel, has no apparent application to this case and must be dismissed.

After hearing the testimony of the parties, examining the exhibits, the pleadings and the Proposed Findings of Fact and Conclusions of Law and Amended and Supplemental Proposed Findings of Fact and Conclusions of Law and memoranda of law submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. The apartment buildings at 2–4 Windsor Terrace, White Plains, New York, have been under the exclusive management of the defendants since on or about March 15, 1968. Defendant Gilman has held an ownership interest in the buildings since that date. Defendant Eisen does not have an ownership interest in the buildings. Albert Gormas, defendants' employee since on or about March 15, 1968, has been the superintendent of these buildings continuously from approximately 1961 to the present.

2. The apartment building at 555 McLean Avenue, Yonkers, New York, has been under the exclusive management of the defendants since on or about December 15, 1967. Defendants Gilman and

Eisen have held ownership interests in the building since that date. Daniel Coleman, defendants' employee since on or about December 15, 1967, has been the superintendent of this building continuously from 1958 to the present.

3. The apartment building at 175 Hawthorne Street, Brooklyn, New York, has been under the exclusive management of the defendants since on or about June 22, 1967. Defendants Gilman and Eisen have held ownership interests in the buildings since that date. Werner Tegfeldt, defendants' employee since on or about June 22, 1967, has been the superintendent of this building from approximately 1955 to the present.

4. The three aforementioned apartment buildings are "dwellings" within the meaning of 42 U.S.C. § 3602(b).

5. Defendants own or operate about 25 residential apartment buildings in Westchester, Bronx, New York, Queens, Kings and Nassau Counties, which house about 5000 tenants. (345, 533.)[1]

6. The management of the Westchester County properties was primarily with defendant Eisen (326); the management of 175 Hawthorne Street, Brooklyn, New York, was primarily in Jeffrey Gilman, the son of defendant Alvin Gilman. (102.)

7. The policy of defendants with respect to tenancies (a) limits the number of persons permitted to occupy an apartment by size of family in proportion to the size of the apartment (165, 170, 416; Deft. Ex. E); (b) persons interested in renting vacant apartments must complete an application on defendants' printed form supplied to each of their superintendents (431–432), with the applicant required to leave a fixed deposit with the application (431), both of which are then turned over to defendants for processing. Processing is not concluded unless an application and deposit are submit-

ted. (157, 172, 275, 358–359, 415, 427, 435.)

8. No superintendent in any of the apartment houses involved has the authority to conclude rental agreements for apartments in any of the three properties involved herein. (167, 415, 438.) The public was informed of vacancies in defendants' apartment houses by signs posted on the exterior of the building and by advertisements in the New York Times and local papers. (221–222, 429, 436; Deft. Ex. H.)

9. The Westchester Urban League gives assistance to minority families in locating housing in the Westchester area. The League tries to determine the existence and availability of apartments in the area for minorities by sending employees and volunteer workers, termed by the League as "testers, verifiers, checkers, clients and applicants,[2]" to determine whether landlords discriminate in renting to blacks. (132–133, 225, 233–234, 245, 261.)

10. From 1967 to date, Sidonia Trommer, a white (243), was gainfully employed by the Westchester Urban League in this area of its activities (108); from June 1969 through March 1971, Mildred Pugh, a black (243), was gainfully employed by the same League in this program (204); Wallace Lucas, a black (244), was a volunteer worker (235, 237), as was Virginia Hausknecht, a white (260–261), for this organization.

11. Sidonia Trommer and Mildred Pugh also had affiliations with the Fair Housing Committee of Yonkers. (146, 226.)

12. Prior to the transfer of 555 McLean Avenue, Yonkers, New York, to defendants, the State Commission for Human Rights had secured an enforcement order of the New York Supreme Court, made by Hon. John H. Galloway

---

1. Unless otherwise identified, numbers in parentheses refer to pages in the trial transcript.

2. A "tester" and "checker" is a black person; a "verifier" is a white person (132–133, 225, 233–234, 245); a "client" and "applicant" is a person interested in housing, either white or black. (135.)

on June 28, 1967, against the then-owners (but not against the present defendants) which affected the operation of said building up to December 31, 1968, involving rental practices, and which order, in part, directed written notice be sent of apartments available for rental to both the Fair Housing Committee of Yonkers and the Urban League of Westchester, allowing said organizations four days from the sending of such notice, to refer interested applicants for such apartments; a copy was also required to be sent to the State Commission for Human Rights. (351; Deft. Ex. T.)

13. When defendants took over the management of 555 McLean Avenue, Yonkers, New York, they were apprised of the aforesaid requirements of the court order. (352, 381, 472.)

14. As vacancies occurred in 555 McLean Avenue, Yonkers, New York, and up to December 30, 1968, defendants sent the notices required by the aforesaid order to the designated agencies. (147, 353–354; Deft. Exs. D, U, V, W.)

15. In 1969 the State Commission for Human Rights at the behest of the Westchester Urban League, moved in the New York Supreme Court to punish defendants and their predecessors in interest for contempt of court of the aforesaid order for alleged failure to comply therewith. The motion was opposed and denied, the Supreme Court finding no violation of said order. (355–356, 495; Deft. Exs. X, Y.) The government has conceded no error in the same. (357.)

16. Daniel Coleman, the superintendent of 555 McLean Avenue, Yonkers, New York, is unable to distinguish color; is legally blind (445); he was examined at the behest of plaintiff to verify same. (363.)

17. In front of and on the wall of the building at 555 McLean Avenue, Yonkers, New York, there are two signs indicating apartment available for rental. (222–223, 429; Deft. Ex. H.) There is no sign specifically indicating

an apartment by the number of bedrooms therein. (362–363, 430.)

Counsel for the United States has devoted considerable interest in the signs reportedly appearing outside the apartment house at 555 McLean Avenue, Yonkers, New York. I fail to discover anything of significance in reference to the signs. I know of no statute or regulation requiring such signs to indicate vacancies and I find no probative force connected with plaintiff's charges as to which signs are particularly significant.

### 18. JONES CLAIM

This claim was brought by plaintiff upon the following grounds:

"(ii) discrimination against black persons in the terms and conditions of rental, in violation of 42 U.S.C. § 3604(b)."

"(iii) making statements indicating their preference to rent apartments to white persons and their intention to discriminate against black persons, in violation of 42 U.S.C. § 3604(c)."

In 1966 Mrs. Myra Veldhuis rented an apartment at 2–4 Windsor Terrace, White Plains, New York from the former owners of the building under a lease running from December 1, 1966 to November 30, 1967 and thereafter occupied apartment 5F, a 3½ room apartment. (47; Ex. 1.) A subsequent lease expiring November 30, 1969 contained this provision: "Exp. Notice Date Aug. 31, 1969." (Ex. 1.)

In November 1967 Mrs. Veldhuis married Dr. Ferdinand Jones, a black, who, after notice of the marriage to the then-management, moved into the apartment with her. (48.)

At the beginning of September 1969, over sixty days prior to the expiration date of Mrs. Jones' lease (November 30, 1969) but subsequent to the "Exp. Notice Date: Aug. 31, 1969" (Ex. 1), Eisen telephoned and asked if she intended to renew her lease, reminding her "that we were under obligation to give the management 90 days notice of our

intent to renew a lease." (59.) Defendants at this time knew that Dr. Jones was a black. (371.) Mrs. Jones told Eisen she did not know yet, that their plans were uncertain. (59.)

Towards the end of September, Eisen again called by telephone, saying he was in the building and wanted to talk to her about "whether or not we had decided to renew the lease." Mrs. Jones thereupon told Eisen that she could not see him and asked if it could be possible to arrange a time when both she and her husband could meet with him to discuss possible renewal. (65, 66.) Eisen declined to come in the evening or to arrange another appointment and stated that he wanted a decision right then and "announced that he had made a decision not to renew the lease and hung up." (66.) Mrs. Jones did not protest the non-renewal by defendants and, in fact, decided not to renew. Mrs. Jones took no action thereafter except to write to Eisen for a copy of the lease. (67–68.) Later, when Eisen asked Mrs. Jones if she wished to renew her lease she said, "No, Mr. Eisen, I have purchased a home." (232–233.)

On October 2, 1969 Eisen wrote to Mrs. Jones stating in part:

> "I am herewith giving you more than the thirty (30) day notice under the law that I will not renew your lease upon expiration and that you will vacate same on November 30th, 1969, and that you will pay your rent up to date, leave the apartment broom clean and turn in all the keys to said apartment and mail box to superintendent.
>
>   *   *   *   *   *   *
>
> "If you have any further questions regarding this matter you may call me at my office between the hours of three o'clock and five o'clock." (Ex. 2.)

In late October 1969 Eisen accompanied superintendent Gormas to the Jones' apartment. Eisen commented that he thought Dr. and Mrs. Jones would be much happier elsewhere. (70.) At the termination of the lease, Dr. and Mrs. Jones moved to 167 Concord Avenue, Hartsdale. (72.)

There seems to be no doubt that the policy of defendants with respect to renewals by other tenants was much more generous. (414, 417, 418.)

The fact that Mrs. Jones did nothing after receiving the notice not to renew is irrelevant. Furthermore, her reasons for not renewing the lease are also immaterial since she and her husband apparently had been told that they were not wanted as tenants.

Consequently, I am compelled to find that this conduct by defendants was discriminatory because of race under 42 U.S.C. § 3604(b).

### 19. OPPENHEIMER CLAIM

Plaintiff did not state under which subsection of 42 U.S.C. § 3604 this claim was made. I shall assume it was subsection (c), i. e., "making statements indicating their preference to rent apartments to white persons and their intention to discriminate against black persons, * * *."

Mrs. Michelle Oppenheimer and her husband, who were whites, became tenants of 2–4 Windsor Terrace, White Plains over two years ago. (394.) Mr. Oppenheimer is connected with the Civil Liberties Union. (478.) Apparently, Mrs. Oppenheimer had seen Eisen some four or five times a year and conversed very casually. (495.)

Mrs. Oppenheimer testified that in December 1969 Eisen told her a two-bedroom apartment was available and that if she had anyone "who was interested I could send them over" and "to make sure that my friends were white." (396, 396–A.) She also stated that Eisen said "he thought my husband would probably be surprised at that" (397) and that "he thought I would understand the necessity for restrictions in certain apartments in order to get the clientele that was desired." (397.)

On cross-examination Mrs. Oppenheimer conceded that Eisen did not tell her when "this two-room apartment was

going to be available" or in which building it was going to be. (405.) She further told Eisen that none of her friends were looking for "one rooms"; that she never sent anybody for a specified apartment (408) and that she referred people to the building not knowing whether there was an apartment available and did not recall sending anyone who was not white. (407.) She made no written statement to the Urban League. (409, 410.) Mrs. Oppenheimer conceded that she recommended no one to go to this apartment house for a two-room apartment and that none of her friends ever applied. (410–411.)

Actually, between December 1969 and April 1, 1970, there were no two-bedroom apartments available for occupancy. (485.) Eisen denied mentioning any upcoming vacancies at 2–4 Windsor Terrace. (507.) Eisen denied any specific recollection of any such conversation (as recited by Mrs. Oppenheimer). (478.) Furthermore, he said he had no conversation with Mrs. Oppenheimer about a two-bedroom apartment being available and "to send some friends."

Plaintiff has not shown that any black applicant was rejected as a result of any alleged statement by Eisen to Mrs. Oppenheimer. Although Eisen denied making the statement, "make sure her friends were whites," under the circumstances, considering the credibility of the witnesses, I conclude that plaintiff has proved by a fair preponderance of the credible evidence that Eisen's statement to Mrs. Oppenheimer was such and, hence, violated 42 U.S.C. § 3604(c).

20. JOHNSON CLAIM

This claim is brought upon the following grounds:

"(i) refusing to rent apartments to bona fide black offerees because of their race and color, in violation of 42 U.S.C. § 3604(a)."

"(ii) discrimination against black persons in the terms and conditions of rental, in violation of 42 U.S.C. § 3604(b)."

"(iii) making statements indicating their preference to rent apartments to white persons and their intention to discriminate against black persons, in violation of 42 U.S.C. § 3604(c)."

One morning in late July 1968 one Raymond Johnson, a black, employed by A.T.&T., earning $12,000 a year, having been referred by Sidonia Trommer, who was connected with the Urban League, visited 2–4 Windsor Terrace, White Plains. (3, 4, 6.) Johnson told the superintendent that he had a wife, an eight-year old son and a four-month old daughter and wanted a two or three bedroom apartment. (7.) The superintendent showed him a two bedroom apartment which he said was available. (8.)

Johnson returned to 2–4 Windsor Terrace the same day at about 2:30–3:00 o'clock. (8.) He told the superintendent that he was interested in renting the apartment. (9.) Johnson testified that at that time the superintendent indicated "that it was a building policy or a company policy that children of opposite sexes could not live in the same bedroom, so I would have to have another bedroom and they didn't have a three-bedroom apartment." (10.) Johnson also said that the superintendent told him that someone had just rented the apartment. (11.)

Johnson conceded that during the morning visit that day the superintendent had told him that an application had to be filled out and that he did not ask for an application. (13.)

Alfred Gormas, who had been the superintendent at 2–4 Windsor Terrace for ten years (159–160) had no power to make leases, only to show the apartment to the prospective tenant, take a deposit and fill out the application. (167.) Gormas denied ever telling Johnson or anybody else that children of opposite sex could not be in the same bedroom and testified that this was not a company

policy. (174.) I believe Gormas' testimony. He was a creditable witness.

Gormas also testified that in 1966 rules were given to him by the prior owners with respect to how many people could occupy an apartment. (168; Ex. E.) A new tenant must sign a lease; there were set "fees" as to a deposit. (172.)

Exhibit E, entitled, "Requirements For Tenancies as of May 1, 1967," contained the following provisions:

"OCCUPANCY

"A family relationship must exist among all occupants of apartment.

"1½–2 room—maximum adults or 1 adult and 1 child.

"1 Bedroom Apartment—maximum 2 adults and 1 child or 3 adults.

"2 Bedroom Apartment—maximum 3 adults or 2 adults and 2 children.

"3 Bedroom apartment—maximum 3 adults and 3 children, or 2 adults and 4 children."

No proof was elicited to the effect that the statement by Gormas, that the apartment was rented, was untrue. Since Johnson did not apply for the apartment at the first visit, defendants were within their rights to rent it to someone else. No proof of statutory violation under 42 U.S.C. § 3604(a), (b) or (c) has been adduced.

### 21. MURRIEL CLAIM

Plaintiff did not state under which subdivision of Section 3604 this claim was made.

In July 1969 one Mrs. Masie Murriel, a black, a community service aide employed by the Department of Social Services of Westchester County (19) visited 2–4 Windsor Terrace, spoke to Mr. Gormas, superintendent, asking if he had a two-bedroom apartment. (20, 21).

Gormas showed her one two-bedroom apartment (21); she told him she wanted the apartment and signed an application (23); Gormas, she said, told her she would have to pay one month's security and one month's rent. (24.) She left the application with Gormas. (28.)

Mrs. Murriel testified that Gormas told her "he would let me know when the application came back to him, it would have to come into New York to be processed, he would then let me know, I would come in with the two months' security and the one month's rent and sign the lease." (46.) The last part of Mrs. Murriel's statement could mean that she said that *she would come in,* pay the two months' security, pay the one month's rent and sign the lease.

Gormas, the superintendent at 2–4 Windsor Terrace, recognized Mrs. Murriel in the court room at trial and testified that Mrs. Murriel filled out an application but gave no deposit and that he told her that her application would not be processed if she did not give a deposit. (175.)

Some days later Mrs. Murriel called Gormas who told her that the apartment had been rented and she left an application for no specific apartment but never went back to find out about it. (34, 39.)

In view of the testimony of Gormas and in view of the established procedures of defendants' processing (see Finding 7), I am unable to accept Mrs. Murriel's testimony as wholly reliable on this point and I find that no arrangement for a deferred payment was made. Thus, defendants in no way discriminated against Mrs. Murriel and, hence, plaintiff has failed to prove violation of 42 U.S.C. § 3604(a) or any subdivision thereof.

### 22. McKEEVER-BROWN SUBLEASE CLAIM

This claim was brought upon the following ground:

"(i) refusing to rent apartments to bona fide black offerees because of their race and color, in violation of 42 U.S.C. § 3604(a)."

On or about March 1, 1967, Harsan Company, then the owners of premises known as 175 Hawthorne Street, Brooklyn, New York, leased apartment 2K in

that building to one James McKeever for a term of two years commencing on April 1, 1967 and ending on March 31, 1969. (Ex. B.) Said lease contained the following provision as to subletting:

"32. After one year and before eighteen months from the date of this lease tenant may submit for landlord's approval a proposed sub-tenant on the landlord's application for apartment, a copy of which will be furnished the proposed sub-tenant. Landlord reserves the right to accept or reject such application at his sole discretion."

Under that lease the aforesaid provision inured to the benefit of defendants as successors in interest. (Par. 28 of said lease, Ex. 31.)

In or about February 1968 McKeever, who was about to be married, asked to occupy a larger apartment, apartment 3F. (90, 91.) He approached one Tegfeldt, the superintendent, and later, according to his testimony, called Alvin or Jeffrey Gilman in reference to subletting apartment 3F (101, 102) and stated that he would advertise for a sub-tenant in the New York Times. Defendants agreed to such advertising. (100.) There is no proof, however, that defendants agreed to sublease the apartment *without* compliance with the terms of the lease hereinbefore stated.

One Esther Brown, a black, unmarried, responded to McKeever's advertisement. (96, 299.) McKeever then gave Gilman Esther Brown's name and gave her Gilman's telephone number. (100.)

McKeever, although he knew Miss Brown was a black when he spoke to Gilman, did not tell him that she was black. He never obtained an application blank to be filled out by Miss Brown.

(105.) He did not know how old Miss Brown was at that time. (107.) (Actually she was only twenty years of age. (280.))

In February 1968, Miss Brown went to see apartment 2K but saw only McKeever, the tenant. (282, 283.)

Although McKeever testified that Jeffrey Gilman had told him that the superintendent, Tegfeldt, had someone "already lined up" for the apartment and that Tegfeldt told him (McKeever) that he did not have anything to do with renting the apartment, there is no evidence in the record that Gilman prior to Esther Brown's complaint to the State Commission, hereinafter mentioned, knew that she was black. Esther Brown testified that she called Jeffrey Gilman in early February 1968, the date after she saw the apartment (283–288) and told him that she had seen the apartment and wanted to apply for it and that Gilman told her that no apartment was available (288) and that he did not anticipate any future "occupancies." (289.) However, there was no proof that Gilman then knew that she was a black.[3]

On or about February 8, 1968 Esther Brown filed a complaint with the State Commission for Human Rights claiming discrimination because of the alleged refusal of Gilman to permit her to sublet the McKeever apartment, allegedly because of the fact that she was a black. (289, 304; Ex. M.) The next day, February 9, 1968 Esther Brown went to defendants' office and filled out an application for the apartment (311; Deft. Ex. P), which was approved on February 19, 1968 (306; Deft. Ex. N), and then received a one-year lease commencing March 1, 1968, terminating February 28, 1969. (280, 290.) On

---

3. An illustration of substituting speculation for proof that defendants knew that Esther Brown (McCammon) was a black; plaintiff's counsel on page 26 of his post-trial memorandum wrote:

"* * * defendants knew that McKeever was advertising the apartment in the Times and anyone of the tenants or Tegfeldt could have seen McCammon inspecting 175 Hawthorne Street and apartment 2–K and told this to one of the defendants or to Jeffrey Gilman. If this fact was known to them, it would explain their bizzare [sic] behavior."

February 20, 1968, Esther Brown wrote a letter to the State Commission for Human Rights withdrawing her complaint and stating that "she believed that she had acted too hastily in accusing Mr. Gilman of prejudice because of her color." (See Ex. N.)

Consequently, I am forced to find that plaintiff has failed to prove by a fair preponderance of the credible evidence that defendants discriminated because of race or color against Esther Brown or violated 42 U.S.C. § 3604(a).

### 23. CLAIM OF ESTHER BROWN FOR FAILURE TO RENEW LEASE

This claim is brought upon the following grounds:

"(i) refusing to rent apartments to bona fide black offerees because of their race and color, in violation of 42 U.S.C. § 3604(a)."

"(ii) discrimination against black persons in the terms and conditions of rental, in violation of 42 U.S.C. § 3604(b)."

On Friday, September 28, 1968, Esther Brown, tenant in apartment 2K, had a party starting at 10:00 P.M. in her two and one-half room studio apartment which consisted of a living room, dining area, kitchen and foyer, attended by thirty adults. Liquor ("Scotch," she supposed) was served and a record player was operated until 3:00 A.M. with the apartment windows open. (308–309.)

On October 1, 1968 defendant Gilman telephoned Esther Brown and told her that the party was disturbing to the other tenants (296.) Esther Brown hung up on Gilman. Jeffrey Gilman also spoke to her about the party. He testified that:

"I recall several most noisy, loud parties, including one that ended about four in the morning with several of her guests spending the rest of the morning or night or whatever in the lobby of the building on the lounges, in the lounge making, I would say, hard nose statements to the superintendent when requested to leave.

"Also, I recall a delivery situation wherein Miss Brown had a delivery man come up to the apartment and had hit the superintendent in the eye." (515.)

He also said:

" * * * we attempted to gain information from Miss Brown as to who this particular person was and she was most uncooperative." (515.)

On December 2, 1968 defendants wrote to Mrs. McCammon that her lease would not be renewed. (309, 521.)

Under the rules and regulations of the McKeever lease and in fact under the leases of all the tenants in the Hawthorne Street apartments, there was the provision:

"15. * * * No Tenant shall play upon, or suffer to be played upon, any musical instrument or operate or suffer to be operated a phonograph or radio in the demised premises between the hours of eleven o'clock P.M. and the following eight o'clock A.M. if the same shall disturb or annoy other occupants of the building. * * * " (Ex. B.)

Furthermore, under the McKeever lease the rent became payable "on the 1st day of each and every month in advance." (Ex. B.)

On or about January 28, 1969 Esther Brown filed another complaint with the State Commission for Human Rights against the Gilman-Eisen Company and Alvin Gilman, managing agent, as respondents, charging the respondents with discriminating against her in denying her renewal of her lease because of her color. (Ex. O.) However, after renewal of her lease for six months, as hereinbefore stated, she wrote a letter to the State Commission for Human Rights stating that she had reached an agreement with Gilman and the company and had signed a six-months lease and further reporting that she was withdrawing her complaint. (See Ex. Q.)

Esther Brown moved on July 16, 1969. (524.) Subsequently defendants instituted a law suit against her for damages to apartment 2K. (313–315; Deft. Ex. R (1–4), Ex. 17.) She was represented by counsel. (314.) The action was later compromised and discontinued. (Deft. Ex. R (4, 5).)

I find (1) that defendants had sufficient reason for declining to renew the Esther Brown lease; (2) that plaintiff has failed to prove that any discrimination took place; and (3) that plaintiff has failed to prove any violation of 42 U.S.C. § 3604(a) or (b).

### 24. TROMMER - PUGH - HAUS-KNECHT-LUCAS INCIDENTS

In regard to the apartment house at 555 McLean Avenue, the government claims that defendants, through their agent, superintendent Daniel Coleman, committed the following unlawful acts:

(1) Coleman's alleged statement to Mrs. Pugh on March 16, 1970, that there were no longer any vacancies at 555 McLean Avenue when in fact there was a vacancy, violated 42 U.S.C. § 3604(d).

(2) Coleman's alleged statements to Mrs. Hausknecht on Friday, March 13, 1970 and again on Tuesday, March 17, 1970, with respect to "undesirable people" who had come to look for apartments, were racially discriminatory, violating 42 U.S.C. § 3604(c).

I shall consider each of these claims separately.

### NO VACANCIES AVAILABLE

(a) On *Friday, March 13, 1970* at *about 8:30 A.M.*, Mrs. *Sidonia Trommer*, a white Urban League employee, visited 555 McLean Avenue, spoke to the superintendent, Coleman. (120, 121.) Mrs. Trommer inquired about a vacant four-room apartment (121), whereupon Coleman told her that such apartments had already been rented but that he had a 3½-room apartment which he would be glad to show. Mrs. Trommer told Coleman she was interested in seeing the 3½-room apartment. The superintendent showed her apartment 5G, which appears to have been then occupied. Coleman told her what the rental and other conditions were. (122–124.) Mrs. Trommer never returned to the building nor had any further contact with the superintendent. (125.)

When Mrs. Trommer visited 555 McLean Avenue she gave Coleman her maiden name, Wein (125), as her married surname (126), stated that her husband was a jeweler, although, in fact, he was an accountant, and that the apartment which she contemplated renting (153) was for her husband and herself (124, 128), although she actually had two children. (136.) In fact, Mrs. Trommer had no intention of renting the apartment or any other apartment. At that time Mrs. Trommer and her family lived in a six-room apartment with three bedrooms (136), under a lease not ending until more than a year thereafter. (154.)

(b) On *Friday, March 13, 1970* at *about 9:00 A.M.*, Mrs. *Mildred Pugh,* a black Urban League employee, visited 555 McLean Avenue. (205, 206.) She met the superintendent, Coleman. (207.) She inquired about the availability of a one-bedroom unit, testifying that Coleman told her that a unit was available. Thereupon Mrs. Pugh accompanied Coleman to apartment 5G, a 3½-room apartment, inquired about the rental (208, 209) and told Coleman that she was interested in that apartment. Coleman told Mrs. Pugh that she must submit an application and give a deposit in the amount of $60.00. (210.) Mrs. Pugh told Coleman that she lived in a private home which she and her husband owned at 139 Bushey Avenue, Yonkers, New York. Although Mrs. Pugh told Coleman that she would telephone him later in the day to indicate that she was still interested in the apartment and that she would submit an application for it, she never did so. (212.)

When Coleman asked Mrs. Pugh what she and her husband did for a living she replied, "I write and he paints." (210.) When further questioned about her writing, she explained that, in con-

nection with her job, she prepared "various reports, etc., things of that nature." Mrs. Pugh testified, "I had no specific meaning there." (211.) Mrs. Pugh, as already stated above, was an employee of the Westchester Urban League (206); her husband was not a painter but owned a delicatessen store and they lived in their own home. Although she lived in Yonkers, Mrs. Pugh told Coleman that she lived in Hastings. (212, 228.)

(c) On *Friday, March 13, 1970* in the *latter part of the morning,* Mrs. *Virginia Hausknecht,* a white Urban League volunteer, visited 555 McLean Avenue, spoke to the superintendent, Coleman, who showed her a 3½-room apartment, apartment 5G. (264.) Mrs. Hausknecht told Coleman that she was very interested in the apartment and that her husband would have to look into it. (265.) Mrs. Hausknecht and Coleman then exchanged telephone numbers. No application or deposit was made at this time. (268–269.)

Mrs. Hausknecht called Coleman that afternoon (i. e., Friday, March 13, 1970) at about *1:00 or 2:00 o'clock,* telling him that she and her husband were interested in the apartment and that her husband would try to get by to see it later that day or the next morning. She also inquired about the conditions for rental. (268.)

On *Saturday, March 14, 1970* at *about 10:00 o'clock,* Coleman called Mrs. Hausknecht and inquired whether she would go ahead with the application without her husband and she said "No." (269.) [4]

(d) On *Saturday, March 14, 1970* between *noon and 2:00 P.M., Wallace Lucas,* a black, who had been referred to the apartment by Mrs. Pugh, visited 555 McLean Avenue, spoke to Coleman, saw apartment 5G, filled out a rental application and gave a $60 deposit.[5] (246, 249, 448.) Coleman informed Lucas that if he wanted the deposit refunded he would have to request it within forty-eight hours. (249.) (The government contends that this statement to Lucas violated 42 U.S.C. § 3604(b), (c). This contention lacks merit. I find that sufficient evidence has not been produced to support this claim.)

On *Monday, March 16, 1970* at *about 3:00 P.M.,* Lucas telephoned superintendent Coleman advising him that he had changed his mind about renting the apartment and that Mrs. Pugh would come later that day to pick up his deposit check. (249–250.)

(e) On *Monday, March 16, 1970* between *5:00 and 6:00 P.M.,* Mrs. *Mildred Pugh* returned to 555 McLean Avenue. There she retrieved from Coleman the deposit check and rental application of Wallace Lucas. (213, 214, 242.) [6]

(f) On *Tuesday, March 17, 1970 late in the morning,* Mrs. Hausknecht returned to 555 McLean Avenue, spoke to Coleman, went to apartment 5G to make measurements, asked for and was given a rental application to take home to have her husband fill out. (270–271.) She

4. Coleman testified that at sometime apparently on or about March 14, 1970 he called Mrs. Hausknecht and asked her if she had made up her mind about the apartment because he had a deposit without an application. He told her he would not keep the apartment unless he had the filled out application and she submitted the balance of the deposit. (448, 449.)

5. I am inclined to conclude that Coleman then believed that a lease in the hand from Lucas was better than a conditional acceptance from Mrs. Hausknecht.

6. Mrs. Pugh testified that on the above occasion she inquired of Coleman as to whether or not *any other units were available* and that he told her "No." Mrs. Pugh then testified:

"Q. Did you say when you inquired about a vacancy what Mr. Coleman's response was?

"A. He said that no units were available." (214.)

The interference which plaintiff attempts to draw from this is that the apartment which had been reserved for Lucas became available again at the time the check was returned via Mrs. Pugh. Apparently this contention ignores the negotiations Coleman had had and was having with Mrs. Hausknecht.

said that Coleman, at her request, accepted $30 in cash. She told Coleman she would return to the building with her husband later that week. (272.) Colement gave her a receipt for the deposit. (271–272, 457–459.)

(g) On *Thursday, March 19, 1970,* Mrs. Hausknecht returned and told Coleman that she and her husband had changed their minds about renting apartment 5G. Coleman returned the deposit. (273.)

I believe that Coleman thought that Mrs. Hausknecht was endeavoring to secure apartment 5G. Mrs. Hausknecht told Coleman that she had no children (264); actually, she had two children. Mrs. Hausknecht told Coleman that she lived at 5900 Arlington Avenue (275); actually, she and her husband lived in a one-family house which they owned at 761 West 231 Street, New York City. (266–267.) Mrs. Hausknecht told Coleman that her husband was in Seattle (278); actually, her husband was not in Seattle. (274.) Although Mrs. Hausknecht indicated that she was interested in renting the apartment and that her husband would try to get by to see it intended to rent the apartment. (274.) (268), she later conceded that she never Superficially Mrs. Hausknecht at this time appeared to Coleman to be a bona fide applicant; however, it developed at trial that she was not.

I find that plaintiff has failed to prove by a fair preponderance of the credible evidence that plaintiff's superintendent deceived Mrs. Pugh or anyone else as to an available apartment or violated 42 U.S.C. § 3604(d).

### "UNDESIRABLE PEOPLE"

On Friday, March 13, 1970, according to Mrs. Hausknecht, while discussing the apartment with Coleman at 555 McLean Avenue, she commented to him that she noticed that a sign with reference to vacancies was down and that Coleman said the reason that it was down was because there had been "undesirable people around there yesterday and this way they could not expect too much." (272.)

Coleman denies the aforesaid statement about "undesirable people." (447, 460.) However, even if he made such a statement, it is insufficient to establish a violation of 42 U.S.C. § 3604(c). Only by innunendo could the court reach a conclusion that "undesirables" meant blacks. Obviously, there are "undesirable" whites.[7]

I find that plaintiff has failed to prove by a fair preponderance of the credible evidence any discrimination by Coleman or defendants on March 13, 1970 in respect to alleged statements in regard to "undesirable people" in violation of 42 U.S.C. § 3604(c).

I find nothing in the testimony of Mrs. Trommer, Mrs. Pugh, Mrs. Hausknecht or Wallace Lucas to sustain any other claim by plaintiff that defendants violated any section of 42 U.S.C. § 3604.

25. The discrimination under 42 U.S.C. § 3604(b) in the Jones claim and under 42 U.S.C. § 3604(c) in the Oppenheimer claim cannot be condoned. Where discrimination is obvious it must be halted immediately. However, discrimination is not always apparent or overt but often appears in insidious and subtle forms. Denigration of individual rights and liberties is the hallmark of discrimination and cannot be permitted to exist under any guise. I find that defendants have been engaged in a "pattern or practice" of discrimination, to the impairment of the full enjoyment of rights insured by law (43 U.S.C. § 3601 et seq.).

7. In connection with proposed findings in respect to the alleged statements by Coleman, counsel for plaintiff wrote:

"The phrase 'undesirable people' as used by the superintendent was a code phrase meaning 'Negroes'. The superintendent's March 13, 1970 statement to Mrs. Hausknecht about 'undesirable people' referred to Mrs. Pugh. His March 17, 1970 statement to Mrs. Hausknecht about 'undesirable people' referred to both Mrs. Pugh and Mr. Lucas." (P. 11 of plaintiff's proposed findings of fact.)

This is not proof but merely speculative innuendo.

## DISCUSSION

The fundamental jurisdiction in this case is based upon Title 28 U.S.C. § 1345, which reads as follows:

"§ 1345. United States as plaintiff

"Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress. June 25, 1948, c. 646, 62 Stat. 933."

## STATUTES

The basic-statute involved is Title 42 U.S.C. § 3604 (Pub.L. 90–284, Title VIII, § 804, Apr. 11, 1968, 82 Stat. 83), which reads as follows:

"§ 3604. Discrimination in the sale or rental of housing

"As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—

"(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, or national origin.

"(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, or national origin.

"(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, or national origin, or an intention to make any such preference, limitation, or discrimination.

"(d) To represent to any person because of race, color, religion, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

"(e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, or national origin."

The procedural section under which the action is brought is Title 42 U.S.C. § 3613 (Pub.L. 90–284, Title VIII, § 813, Apr. 11, 1968, 82 Stat. 88), which reads as follows:

"§ 3613. Enforcement by the Attorney General; issues of general public importance; civil action; Federal jurisdiction; complaint; preventive relief

"Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this subchapter, or that any group of persons has been denied any of the rights granted by this subchapter and such denial raises an issue of general public importance, he may bring a civil action in any appropriate United States district court by filing with it a complaint setting forth the facts and requesting such preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for such pattern or practice or denial of rights, as he deems necessary to insure the full enjoyment of the rights granted by this subchapter."

## INTERPRETIVE DECISIONS

Since the relevant statutes are recent there are few interpretive decisions.

## 1. PUBLIC POLICY

Sirica, District Judge, District of Columbia, in Young v. Netherlands Owners, Inc., 306 F.Supp. 1282 (D.D.C.1969), with respect to public policy, wrote as follows:

" * * * The public policy in this area is clearly defined by the Civil Rights Act of 1866, 42 U.S.C. §§ 1982 (1964), which provides:

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, *purchase*, lease, sell, hold, and convey real and personal property. [Footnote omitted.] (Emphasis supplied.)"

## 2. PATTERN OR PRACTICE

The court must determine the pivotal question of whether defendants' acts of discrimination under the Jones and Oppenheimer claims constituted isolated incidents or were part of a "pattern or practice" of discrimination. The Fair Housing Act of 1968 does not define "pattern or practice," and the phrase is not explained by legislative history. However, there have been judicial and legislative interpretations of the phrase under earlier civil rights acts, such as the Civil Rights Act of 1960, 42 U.S.C. § 1971(e).

"Pattern or practice" was defined as follows by Chief Judge Thomsen in United States v. Mintzes, 304 F.Supp. 1305, 1313–1314 (D.Maryland 1969), in what was said to be the first action brought by the Attorney General under 42 U.S.C. § 3613 to enforce the provisions of subsection (e):

"The phrase 'pattern or practice' is not defined in the Act, and is not explained by the legislative history. The phrase has been used in similar statutes. The number of incidents necessary to show a pattern or practice depends upon the nature of the right protected and the nature of the ordinary violations of such right. Both

sides in this case have relied upon United States v. Mayton, 335 F.2d 153, at p. 159 (5 Cir. 1964), where the Court said:

" 'The words pattern or practice were not intended to be words of art. No magic phrase need be said to set in train the remedy provided in § 1971(e). Congress so understood them. And the legislative history reflects the adoption of the approach epitomized by Deputy Attorney General Walsh before the House Judiciary Committee:

" ' "Pattern or practice have their generic meanings. In other words, the court finds that the discrimination was not an isolated or accidental or peculiar event; that it was an event which happened in the regular procedures followed by the state officials concerned." ' "

" 'That interpretation was reiterated by Mr. Walsh in subsequent testimony, and it was confirmed on the floor of the Senate by Senator Keating on the day the Act was passed:

" ' "The 'pattern or practice' requirement means only that the proven discriminatory conduct of the defendants was not merely an isolated instance of racial discrimination" ' ."

See also United States v. Hunter, 324 F. Supp. 529, 534–535 (D.Maryland 1971).

In an action against the owner of a high-rise apartment unit for an alleged "pattern or practice" of racial discrimination in the rental of housing, under the relevant statutes involved in the case at bar, the United States Court of Appeals for the Fifth Circuit in United States v. West Peachtree Tenth Corporation, 437 F.2d 221 (1971) held:

" * * * To be sure, they [pattern or practice] [was] intended to encompass more than an 'isolated or accidental or peculiar event.' " (437 F.2d at 227.)

■ Under this yardstick, it is clear that defendants discriminated under the

Oppenheimer and Jones claims. While it is true that an "isolated or accidental or peculiar event" constituting a single act of discrimination does not rise to the level of the "pattern or practice" requisite to federal court action, the evidence presented to the court under the Oppenheimer and Jones claims establishes a "pattern or practice" of discrimination.

## 3. FUNCTION OF THE DISTRICT COURT

■ District Judge Thomsen in United States v. Hunter, 324 F.Supp. 529 (D. Maryland 1971), in respect to the function of the District Court, wrote:

"Under § 3613 the Attorney General may bring a civil action for an injunction and other appropriate relief whenever he has reasonable cause to believe either 'that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this subchapter', or 'that any group of persons has been denied any of the rights granted by this subchapter and such denial raises an issue of general public importance'. The Attorney General is proceeding in this case under both alternatives. A court should not review the Attorney General's finding of reasonable cause, but before granting relief should determine that such a pattern or practice of resistance exists or that there has been such a denial of rights as would justify the granting of the relief prayed. United States v. Mitchell, 313 F.Supp. 299, 300 (N.D.Ga. 1970); United States v. Building & Construction Trades Council, 271 F. Supp. 447, 453 (E.D.Mo.1966)." (324 F.Supp. at 530–531.)

## 4. ALTERNATIVE RELIEF

Judge Thomsen also further wrote as follows in respect to alternative relief:

"The alternative justification for relief is for the Government to show 'that any group of persons has been denied any of the rights granted by this subchapter and such denial raises an issue of general public importance'. No black person is shown to have complained of either of the two ads which form the basis of this case. The ads in the Washington daily papers show that similar ads are customarily published both by white and 'colored' homeowners.[4] The Government did

"4. The alternative methods of enforcement should be considered. Section 3610 provides that a person who claims to have been injured by a discriminatory housing practice, or who believes that he will be irrevocably injured by a discriminatory housing practice that is about to occur, may file a complaint with the Secretary of Housing and Urban Development, who shall attempt to correct the alleged discriminatory housing practice by informal methods of conference, conciliation and persuasion. If the Secretary is unable to obtain voluntary compliance within a specified period, the party aggrieved may within 30 days thereafter 'commence a civil action in any appropriate United States district court, against the respondent named in the complaint, to enforce the rights granted or protected by this subchapter,' subject to certain provisos. Section 3612 provides for the enforcement of the rights granted by §§ 3603–3606 by private civil actions. The remedies provided by § 3610 and § 3612 will be effective in certain types of cases." United States v. Hunter, 324 F.Supp. 529, 535 (D.Maryland 1971).

not prove that anyone has been actually offended or caused any inconvenience by the two ads involved in this case.

"The Court has found that the ads violated § 3604(c) and that the application of that subsection to such advertisements does not deprive defendant of any of his constitutional rights. But every violation of § 3604(c) does not raise an issue of such general public importance as to justify an injunction, where no pattern or practice has

been shown, and where the court is satisfied that the defendant will obey the law as declared.

### 5. BURDEN OF PROOF

■ It is elementary that a suit for injunction is a civil suit, governed by rules of procedure applicable to other civil suits. More particularly, an injunction suit is one of equity (43 C.J.S. Injunctions § 162, p. 779).

■ It is also basic that in actions for injunctive relief the burden of proof is, as a rule, on the plaintiff to establish the right to injunctive relief (43 C.J.S. Injunctions § 166, p. 884).

■ Hence, in this type of action, as in other similar actions for injunctions, the burden is upon the United States to show discrimination under the terms of the statutes. United States v. Holmes County, Miss., 385 F.2d 145 (5th Cir. 1967); Meredith v. Fair, 298 F.2d 696 (5th Cir. 1962); Dean v. Ashling, 409 F.2d 754, 756 (5th Cir. 1969); Raiford v. Dillon, 297 F.Supp. 1307, 1310 (S.D. Miss. 1969).

■ It is elementary that no verdict of a jury can be based upon speculation or conjecture. The same rule must apply to a determination of the court after a non-jury trial. In certain proposed findings of fact hereinbefore set forth and submitted by plaintiff it became evident that portions of plaintiff's assertions were based largely on speculation and conjecture, and, hence, must be weighed accordingly.

### 6. FACTORS TO BE CONSIDERED AS TO ISSUE OF APPROPRIATENESS OF GRANTING INJUNCTION

In Raiford v. Dillon, 297 F.Supp. 1307, 1313 (D.Miss. 1969), the court wrote:

"In United States v. Atkins, 323 F. 2d 733, 739 (5th Cir. 1965), and again in Pullum [Pullum v. Greene, 396 F.2d 251 (5th Cir. 1918)], the Fifth Circuit emphasized the three factors cited by the Supreme Court in Grant [United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)] as relevant to whether an injunction should issue under the circumstances present in the case at bar, that is, (1) 'the bona fides of the expressed intent to comply' ; (2) 'the effectiveness of the discontinuance' ; and (3) 'in some cases, the character of the past violations.' "

After hearing the various witnesses and noting their responses, the court has carefully examined the testimony as reported in the transcript of the trial, reviewed the exhibits which were submitted, and considered the post-trial papers submitted by counsel, which included proposed findings of fact and conclusions of law.

In making the ultimate finding as to each of these claims, the court has taken into consideration the relevant and surrounding circumstances, the probability of factual knowledge of each witness, as well as impressions on the court with respect to the veracity of the testimony.

■ Only the Jones and Oppenheimer claims are sustained. All others are dismissed. As heretofore indicated, however, I believe these are sufficient to constitute a "pattern or practice" under Title 42 U.S.C. § 3613 and, hence, an appropriate injunction should issue.

### CONCLUSIONS OF LAW

1. The court has jurisdiction over the subject matter and of the parties.

2. The rights of the parties are governed by Title 42 U.S.C. § 3601 et seq.

3. Plaintiff has failed to establish a fair preponderance of the credible evidence that:

(a) Defendants discriminated in the rental of housing under the JOHNSON CLAIM in violation of 42 U.S.C. § 3604 (a), (b) or (c) ;

(b) Defendants discriminated in the rental of housing under the MURRIEL

CLAIM in violation of any subdivision of 42 U.S.C. § 3604;

(c) Defendants discriminated in the rental of housing under the McKEEVER-BROWN SUBLEASE CLAIM in violation of 42 U.S.C. § 3604(a);

(d) Defendants discriminated in the rental of housing under the CLAIM OF ESTHER BROWN FOR FAILURE TO RENEW LEASE in violation of 42 U.S. C. § 3604(a) or (b); and

(e) Defendants discriminated in the rental of housing under the TROMMER-PUGH-HAUSKNECHT-LUCAS INCIDENT in violation of 42 U.S.C. § 3604 (c) or (d).

4. Plaintiff has established by a fair preponderance of the credible evidence that:

(a) Defendants discriminated in the rental of housing under the JONES CLAIM by discriminating against blacks as to the terms and conditions of rental in violation of 42 U.S.C. § 3604(b);

(b) Defendants discriminated in the rental of housing under the OPPEN-HEIMER CLAIM by making statements indicating their preference to rent apartments to white persons and in their intention to discriminate against black persons in violation of 42 U.S.C. § 3604(c).

6. Under the JONES and OPPEN-HEIMER CLAIMS defendants engaged in a "pattern or practice" of discrimination. 42 U.S.C. § 3613.

7. Plaintiff, United States of America, is entitled to an injunction enjoining defendants Alvin Gilman and Mitchell Eisen d/b/a Gilman-Eisen Co. permanently from:

(a) Discriminating against blacks in the terms and conditions of rental of apartments in dwellings owned and/or operated by defendants;

(b) Making statements indicating that apartments will not be rented to backs in dwellings owned and/or operated by defendants.

Settle judgment on notice pursuant hereto.